ALASKA S. S. CO. v. INTERNATIONAL LONGSHOREMEN'S ASS'N OF
PUGET SOUND et al.

(District Court, W. D. Washington, N. D.    September 5, 1916.)

No. 95 E.

1. CONSPIRACY ⬡⇒1—WHAT CONSTITUTES.
    A conspiracy is a combination of two or more persons by concerted
    action to do an unlawful thing, or to do a lawful thing in an unlawful
    manner.
    [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 1–5; Dec.
    Dig. ⬡⇒1.
    For other definitions, see Words and Phrases, First and Second Series,
    Conspiracy.]

2. CONSPIRACY ⬡⇒2—NATURE OF CONSPIRACY—DEFENSES.
    No formal agreement is necessary to a conspiracy, a tacit understand-
    ing being sufficient; and it is not essential that each conspirator have
    knowledge of the details, the means to be used, or that the agreement
    be enforceable.
    [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 2; Dec. Dig.
    ⬡⇒2.]

3. CONSPIRACY ⬡⇒13—ACTS OF AGENTS—LIABILITY OF PRINCIPALS.
    The acts of agents and employés in furtherance of a conspiracy are the
    acts of the principal.
    [Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 14; Dec. Dig.
    ⬡⇒13.]

4. TORTS ⬡⇒10—STRIKES—PICKETS.
    Where a picket around an employer's place of business is established
    by union strikers, the picket is the agent of the union, and efforts to dis-
    suade others from accepting employment offered by the former employer
    should go no further than peaceable persuasions and inducements.
    [Ed. Note.—For other cases, see Torts, Cent. Dig. § 10; Dec. Dig. ⬡⇒
    10.]

5. TORTS ⬡⇒10—STRIKES—ORGANIZATION—RIGHTS OF TRADE UNIONS.
    Laborers may combine, forming unions to protect their rights, and they
    have the right to persuade others, when they have gone on strike, not to
    work for the employer; such rights being given under the freedom of ac-
    tion guaranteed by the federal Constitution.
    [Ed. Note.—For other cases, see Torts, Cent. Dig. § 10; Dec. Dig. ⬡⇒10.]

6. TORTS ⬡⇒10—EMPLOYERS—RIGHTS OF.
    While laborers, members of a union, may strike, and may picket their
    employer's business, the employer is entitled to free access to his place
    of business for himself and other employés, and such rights cannot be in-
    terfered with.
    [Ed. Note.—For other cases, see Torts, Cent. Dig. § 10; Dec. Dig. ⬡⇒10.]

7. INJUNCTION ⬡⇒101(3)—STRIKES—INTERFERENCE BY FORCE.
    Act Oct. 15, 1914, c. 323, § 20, 38 Stat. 730, declares that no restraining
    order or injunction shall be granted in any case between an employer and
    employés, or between persons employed and persons seeking employment,
    involving or growing out of a dispute concerning the terms or conditions
    of employment, unless necessary to prevent irreparable injury to property
    or property rights, and that no such restraining order shall prohibit any
    person or persons, whether singly or in concert, from terminating any
    employment, or from ceasing to perform any work or labor, or from recom-
    mending, advising, or persuading others by peaceable means to do so.    Em-

⬡⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ployés of complainant, a ship company, engaged as a common carrier, which also carried the mails, struck, and defendants, composing the union of which they were members, picketed the wharves of complainant and intimidated other laborers from accepting complainant's offers of employment. Defendants threw rocks on the wharves, and in other ways interfered by violence with complainant's business and access to its ships. Interstate Commerce Act Feb. 4, 1887, c. 104, § 3, 24 Stat. 380 (Comp. St. 1913, § 8565), and section 10, as amended by Act March 2, 1889, c. 382, § 2, 25 Stat. 857 (Comp. St. 1913, § 8574), respectively declare that every common carrier subject to the provisions of the act shall afford reasonable facilities for the exchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines, and that any common carrier which shall willfully omit to do any act or thing required to be done shall be guilty of a misdemeanor. *Held* that, though defendants were authorized under the statute to persuade third persons to decline complainant's offers of employment, and to refuse to deliver goods to complainant, or to patronize it, their interference with complainant's transportation business by violence was unlawful and will be enjoined, as it would not only expose complainant to loss, but to prosecution for violations of law.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 174, 175; Dec. Dig. ☞101(3).]

8. TORTS ☞10—STRIKES—LIABILITY FOR ACTS OF UNION.

A trade union, conducting a strike, is liable for the unlawful acts of members and others associating themselves with the strikers, unless such acts be disavowed, and, in the case of members, the offenders be disciplined or expelled.

[Ed. Note.—For other cases, see Torts, Cent. Dig. § 10; Dec. Dig. ☞10.]

In Equity. Bill by the Alaska Steamship Company against the International Longshoremen's Association of Puget Sound and others. Injunction granted.

Bogle, Graves, Merritt & Bogle, of Seattle, Wash., for plaintiff.

Thomas B. MacMahon, of Seattle, Wash., for defendants.

NETERER, District Judge. The complainant alleges, in substance, that it is a foreign corporation doing business in the state of Washington, and doing a common carrier business of passengers and freight; that it owns, controls, and operates a steamship line extending from the ports of Puget Sound to divers ports in the territory of Alaska, and at such ports in the territory of Alaska it has connections with lines of railroads and other lines of steamships and facilities for the interchange of traffic, and that it is subject to the provisions of the act of Congress known as the "Interstate Commerce Act," and its amendments; that in the conduct of its business it employs a large number of men in and about its docks and piers, for the purpose of receiving and discharging freight, and in the handling of the passenger traffic, and that it was and is operating from Piers 2 and A in Seattle; that the defendants are citizens of Washington, domiciled in this district; that J. A. Madsen is secretary of the Longshoremen's Association, and M. E. Wright, assistant secretary, and M. Myers, president of the local union thereof in Seattle, known as "Local 38—12"; that George Whistler is secretary of said local union, and the defendants Smith and Conners are members and officers thereof; that on the 1st day of

June its employés, engaged in the handling of freight at said piers, were members of the defendant union and were known as longshoremen, and without complaint on said day all employés quit work, and thereafter submitted demands for certain concessions as to hours of service and compensation, which demands were granted, and on the 10th of June following they returned to work; that on the 22d of June, without any demand or statement of grievance, and without notice, all of said member employés again quit work and have since remained away from such service; that immediately upon the employés ceasing to labor the plaintiff, "in order to * * * discharge its duties as a common carrier and perform its obligations under the laws of the United States," employed other workmen; that thereupon, "and at the time of the strike of June 22, 1916, the defendant association and the officers thereof, and the other defendants who are parties hereto, and other officers and members of said association to plaintiff unknown, combined and conspired with each other, and combined and conspired with other organizations, * * * to prevent the plaintiff from carrying on its business, * * * and in pursuance of such combination and conspiracy endeavored, and are endeavoring, unlawfully to force and compel the workmen now in the employ of the plaintiff to leave its service; * * * that by threats, display of numbers, jeers, and by other unlawful means" defendants intimidated and prevented, and continued so to do, the employés from remaining in plaintiff's service; that they have assaulted the employés of the plaintiff, stoned them in the streets as they approached Pier 2, and have driven away those about to enter the employment of plaintiff, and "have turned back and driven away from said piers passengers who were going thereto to take passage upon the vessels of plaintiff, and have stopped wagons carrying equipment for said vessels from entering said piers, and have forced them to drive away, so that said equipment could not be loaded upon said vessels;" and other like conduct is set forth, and it alleges the threatened destruction of the property of the complainant.

Upon motion of the complainant, based upon the verified bill, a temporary restraining order was issued on the 7th of July, and the matter set for hearing on July 15th on application for temporary injunction, and the order directed to be served upon the defendants, with notice to appear at said time and show why a temporary injunction should not be granted. At the appointed time the defendants appeared and filed answers, denying all of the charges of the complaint, and announced readiness for trial upon the merits. Upon the consent of both parties the case was set for trial on the 27th day of July, and the restraining order continued until that time. Testimony at said time was submitted on the part of the complainant and the defendants, and the cause taken under advisement, and by consent of both sides was continued to September 5th, the restraining order remaining in force.

The testimony shows that the International Longshoremen's Union is a voluntary association, divided into districts, each district having its organization and affiliation with the international body; that the

Pacific Coast comprises one district, of which J. J. Foley, of San Pedro, Cal., is president, and J. A. Madsen, of Portland, Or., secretary, and that M. E. Wright, is an employé in the office of the secretary, who attends to the business of the office during the secretary's absence; that C. Conners and S. C. Smith are members of the executive board, and M. Myers, president, and George Whistler, secretary, of the Riggers' and Stevedores' Union; that the district association has series in each port which are designated from 1 to 59, some having ceased to exist, but 40-odd local organizations are now in existence, the Pacific Coast district being known as "Local 38," and the number and series of the Seattle organization is "Riggers' and Stevedores' Local Union No. 38—12," which has a membership of 700 or 800. May 1, 1916, at a convention held at Seattle of the district association "Local 38," a scale of wages and hours of employment was adopted. This was to be presented to the employers for acceptance, and "it was decided to enforce a wage scale and working rules." "The men were to cease work for those firms that declined to pay the scale, on June 1st, 6 a. m." On May 25th demand was presented to the complainant company "for an increase of wages and working conditions." The demand being ignored, the employés quit work on June 1st. Thereafter complainant "granted all the demands that were asked," and the men returned to work June 10th. The executive board of the defendant association negotiated the terms upon which the men returned to work with the Employers' Union of San Francisco, which also represented the Employers' Union of Puget Sound. On the 22d day of June, without notice or further demand, the employés again quit work, and have not since returned. Mr. Wright, upon inquiry, told Pierson of complainant company:

"That the strike of the Alaska Steamship Company was not intended; that they did not have orders to strike on the Alaska Steamship Company, and * * * that he would have the matter straightened out by 5 o'clock that afternoon; but I never heard anything from Mr. Wright until the afternoon of the 24th, when he * * * and Barry * * * came down to Pier 2 and said that unless we could guarantee to give them all the work at the smelter they would still stay out on our vessels"

—the smelter referred to being the smelter at Tacoma, with the operation of which plaintiff had nothing to do. The complainant company employed from 90 to 120 men, and Mr. Pierson, the general manager, stated that after the strike was called—

"they [the strikers] gathered in front of Pier 2 and also Pier A in large numbers, sometimes more than 100, and they would stop any one that looked like a workman, question him whether they would let him go on the dock or not. Even passengers of our ships with tickets were stopped." "They would stop a man, or take hold of him, and want to know where he was going, what business he had on the dock, whether he was looking for a job."

In reply to the inquiry, "Were any of the employés attacked in any way going to or from the dock?" he said, "Well, I don't know that there was any one beaten up, but they were stopped." This witness further stated that quarters were provided by complainant for the men employed in the steamer Dolphin at an expense to the complainant

of approximately $10,000 a month, and that "when we had them employed on the docks close in to the head of the dock they [employés] were stoned, not once, but dozens of times," and that immediately upon the temporary restraining order being issued all trouble ceased, and he also stated, "We did have a wagon or so stopped." On cross-examination, he said that he saw stones thrown, but he did not know who threw them; that no one was arrested; that no complaint was made, except to the officers on the dock; that no person could be identified, except "they were all button men mostly"; but he could not identify the button as the longshoremen's button. When asked how he knew that the defendants threw the stones, he stated:

"Because I know those men went on a strike, and they were doing everything they could to prevent us doing business. Q. Aside from the stones that were thrown, that you said did no damage either to the car or to the dock, and the matches that were burned, which you did not own, nothing happened? A. No; nothing."

A Mr. Cushing was assaulted a day or two after a member of the strike committee heard him ask a third party whether he wanted work and tell this party he could obtain work at Pier 2 "and receive 50 cents an hour day time, 75 cents overtime, and free board and room." He was assaulted by men who wore "buttons," and the witness thought they were longshoremen's buttons.

Carl King, an employé, as he was leaving the plaintiff's plant, was accosted by two men, who took hold of him and asked what he was doing, and, after stating that he was a wireless operator, was asked to produce his license. Not having it with him, he was permitted to go, after presenting a student's identification card of the University of California, of which he had been a student.

Mr. O'Connor, an employé of complainant, was assaulted on Occidental avenue, between Main street and First avenue, by four men, one of whom knocked him down with brass knuckles. Three longshoremen were arrested and are awaiting trial.

George Miles, driving a truck for the Carmen Manufacturing Company, attempted to deliver a load of mattresses to complainant, and was told by some of the men on strike that he "had better not go in there, and to take the load back," and thereupon returned.

John Smith, chief stevedore of complainant company, testified that a large number of longshoremen intimidated a crew employed by him on the Admiral Evans while she was unloading at Stacy Street Dock No. 1, by entering upon the vessel and compelling the laborers to go into the hold of the ship. Other acts were disclosed by the testimony which need not be detailed. There was a strike upon all of the docks and piers in the city of Seattle, except the port commission, which had entered into some arrangement with the strike committee, and the strike was ordered by "38—12," except as to plaintiff's docks, but was afterwards extended to these docks, and pickets were placed upon the various docks in the city of Seattle, and a strike committee and bail committee appointed.

A number of witnesses were examined on the part of the defense, in which denial is made of any participation in any of the acts complained

of, but only one member of the picketing committee was called and testified.

[1-3] A conspiracy is defined as a combination of two or more persons by concerted action to do an unlawful thing, or to do a lawful thing in an unlawful manner. Pettibone v. United States, 148 U. S. 205, 13 Sup. Ct. 542, 37 L. Ed. 419. No formal agreement is necessary. A tacit understanding is sufficient, and it is not essential that each conspirator have knowledge of the details of the conspiracy, the means to be used, or that the agreement be enforceable. Acts of agents and employés in furtherance of the conspiracy are the acts of the principals. United States v. Keitel, 211 U. S. 379, 29 Sup. Ct. 123, 53 L. Ed. 230.

[4-6] A picket may be considered an agent of a labor organization, and where a picket is established it could go no further than interviews, peaceable persuasion, and inducements; and slight violence or intimidation will have much weight with a chancellor in determining the character of a picket, or the acts of men under its direction, since a picket, under the most favorable consideration, is for the purpose of interference between one who wishes to employ and those seeking employment. No fair-minded, unprejudiced person should desire to place any obstacle in the way of the lawful operation of labor organizations, or do any act prejudicial to such associations. There are always found, however, some reckless and revengeful persons among the membership of such organizations, and vicious and lawless persons sometimes take advantage of labor strikes to commit acts of violence against persons and property, or induce others to do so, for the purpose of wreaking a personal vengeance, or casting suspicion upon and creating public sympathy against strikers, so that great caution should be taken by labor organizations on declaring a strike, and those doing picket duty, to see that no rights of others, by their members, are transgressed. Courts have invariably upheld the right of individuals to form labor organizations for the protection of the interests of the laboring classes, and such right is recognized by the Unlawful Restraint and Monopoly Act. Organized labor is organized capital, consisting of brains and muscle, and has as lawful a right to organize as have the stockholders and officers of corporations who associate and confer together with relation to wages of employés or rules of employment, or to devise other means for making their investments more profitable. Organized labor and organized capital have equal lawful rights to associate, consult, and confer with relation to wages and rules of employment. Ames v. Union Pacific (C. C.) 62 Fed. 7; Thomas v. Cincinnati, N. O. & T. P. Ry. Co. (C. C.) 62 Fed. 803. Justice Holmes, in Vegelahn v. Guntner, while sitting on the Supreme Court of Massachusetts, 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443, said:

"If it be true that workingmen may combine with a view, among other things, to getting as much as they can for their labor, just as capital may combine with a view to getting the greatest possible return, it must be true that, when combined, they have the same liberty that combined capital has to * * * bestowal or refusal of those advantages which they otherwise lawfully control."

It is not unlawful for persons to combine merely to regulate their own conduct with relation to legitimate competition, although others may be indirectly affected thereby. The right of property and liberty of action is guaranteed by the Constitution of the United States to every citizen of this country, and is not confined to political rights, but extends to activities in and about the daily business of life, whether it be of employé or employer. The laborer may organize for protection, and his privilege to work for whom and when he desires is granted, and the right of the employer to employ whom he elects at a satisfactory price is not denied, and neither can secure more, and must not accord less. The employer is also accorded the freedom of access to the place where his work is done, and when access is through a public street, unobstructed access is not inconsistent with any right striking laborers have to use such street for the lawful conduct and peaceable assembling in a lawful manner and for lawful purposes; but any person, while engaged in a lawful endeavor of advancing his interest and securing the greatest benefit in a lawful manner, must not attempt to secure such ends by infringing the rights of others, and when that is done it is the duty of the court, when the matter is properly presented, to intervene. Courts cannot create rights, or initiate new powers or privileges, and can only define existing rights, and apply to them the recognized powers and privileges within its limitations. The creation of new rights or powers is not a judicial function. That is a matter of legislation.

The defendants had the right, if they so desired, to cease to work. Whether they had good cause or not is not for this court to say. On the other hand, the complainant had the right, upon the defendants ceasing to work, to employ whom it elected, and to be protected against overt acts of defendants against such employés, and to have the unobstructed use and enjoyment of its property. The rights of the several parties, as stated, are reciprocal, and are measured by the same rule.

[7, 8] In determining the rights of the parties in this issue, consideration must be given to section 20, chapter 323, 38 Stat. at Large, page 730, which provides:

"That no restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employés, or between employers and employés, or between employés, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from

recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

With this provision should be considered section 3 of the Interstate Commerce Act (24 Stat. 379), which provides:

"Every common carrier subject to the provisions of this act shall, according to their respective powers, afford all reasonable * * * facilities for the interchange of traffic between their respective lines, and for the receiving, forwarding, and delivering of passengers and property to and from their several lines and those connecting therewith."

Also section 10 of the same act, as amended (25 Stat. 857), which says:

"Any common carrier * * * or any * * * agent, or person, acting for or employed by such corporation, who, alone or with any other corporation, company, person, or party, * * * shall willfully do or cause to be done, * * * or shall willfully omit or fail to do any act, matter, or thing in this act required to be done, * * * or shall aid or abet * * * such omission or failure, * * * shall be deemed guilty of a misdemeanor."

Sections 3 and 10 supra impose duties on complainant, with penalties attached for violation. The testimony shows that the complainant company is a carrier of interstate commerce. It likewise carries United States mail from the port of Seattle to the various ports and places in the territory of Alaska, at which ports the commerce and mails are delivered to the various connecting lines of transportation, and as such carrier sustains a special relation to the public. It is clearly established that the defendants did co-operate and confederate together and with others for the purpose of preventing the plaintiff from carrying on its business as a carrier of interstate commerce and United States mail. It is also established that the acts done went beyond the privilege extended and license granted to defendants by section 20, supra, and infringed upon the rights of complainant, and that these acts are attributable to defendants. The settlement of the strike on June 1st was brought about by some of the defendants with the Employers' Union of San Francisco and of Puget Sound. They negotiated a status with the port commission of Seattle, and directed the strike in Seattle, if not against the complainant, against other employers of their labor upon the docks of Seattle, acting through strike committees, who were given charge of the conduct of the strike, and who appointed members to do picket duty, which strike extended to complainant's property, and was recognized by the defendants and carried on by them. It further shows that strikers congregated in large numbers about the plant and place of business of the complainant company; that they jeered persons going in and out, not using any vile language, however, to or in the hearing of persons approaching the piers; that several persons employed by plaintiff were assaulted; that rocks were thrown upon the docks of complainant, where men

were employed, either by longshoremen or by some persons who mingled with the men on strike and must have been known to the strikers, and no action was taken to suppress such conduct, or to apprehend the parties, or disavow such acts; that the freedom of movement of persons going upon complainant's docks was interrupted by members of the defendant union; that these acts continued until the granting of the restraining order.

While there is no testimony that any of these acts were expressly authorized, there is no evidence that the acts were disapproved, or members disciplined or expelled. The testimony does show that the defendants did have control of the situation, and did not exercise their influence or power to correct the irregularities or disavow the acts until the issuance of the temporary restraining order and service upon the defendants, when all overt acts ceased, which considered with what defendants did do, confirms the conclusion that the acts were under the authority and within the control of defendants. When persons or parties set in motion machinery for the purpose of shaping sentiment, they cannot take the benefits, without also being burdened with responsibilities. Such parties thereby assume the burden of controlling such agency, if within their power; and if, perchance, some persons unauthorized, acting with defendants, commit unauthorized acts, it is incumbent upon the defendants to show such fact, and, if committed by members under the control of the association, to disavow such acts by causing such offending members to be disciplined or expelled. The testimony before the court does not show that any attempt was made to destroy the property of the complainant, except the revenues for transportation of traffic; nor does the evidence justify the conclusion that the defendants unlawfully prevented "wagons carrying equipment for said vessels from entering said piers." The testimony of the driver of the wagon shows that the request was not to deliver, and was clearly within the license granted by section 20, supra. I think it is clearly shown that the rights of the complainant as an interstate commerce and United States mail carrier were violated, that defendants exceeded the privileges granted by the Anti-Trust Act, supra, and the duty imposed upon plaintiff by the Commerce Act was jeopardized.

It is not the purpose of this court to undertake the policing of the city of Seattle with relation to the employés of complainant, but the issue here is limited to Piers 2 and A and approaches thereto. Nor is it the purpose of the court to abridge any of the rights given by section 20 of the Anti-Trust Act, supra. Defendant officers and members of defendant association will be enjoined from unlawfully causing, inducing, or in any way forwarding any of the acts complained of as limited herein, and in accordance with the view herein expressed.

A decree may be presented.