PUGET SOUND TRACTION, LIGHT & POWER CO. v. WHITLEY et al.

(District Court, W. D. Washington, N. D.    July 25, 1917.)

No. 131–E.

1. TORTS ⬦10—ORGANIZATION OF LABOR.

The right to employ labor and the right to be employed is inherent, and an organization of laborers, intended merely to regulate their own conduct with respect to legitimate competition, is legal.

2. COURTS ⬦326—FEDERAL COURTS—JURISDICTION.

When diversity of citizenship appears, and the property rights of a street railroad company, which were very valuable, were involved, in a suit to obtain protection from striking employés, the federal court has jurisdiction.

3. INJUNCTION ⬦137(2)—TEMPORARY INJUNCTIONS—STRIKES.

A street railroad company filed a complaint in the federal court praying an injunction restraining numerous defendants and all persons combining or confederating with them from interfering with its employés in the operation of its street cars. The complaint showed that the property rights of the company were involved, and an ex parte petition for a temporary injunction alleged that defendants and other strikers prevented the operation of the company's cars, but failed to show that the picketing done by the strikers and others was unlawful. Affidavits filed in support of the application showed that mobs of strikers and their sympathizers prevented the operation of street cars, and that the police protection was insufficient, but did not in any way show that defendants were the leaders of any organization which resorted to violence to prevent the operation of the company's cars. *Held,* that in such case the company's remedy was to apply for police protection to the proper executive, and an injunction, whereby the company's property would be protected by federal marshals, should be denied.

---

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Bill by the Puget Sound Traction, Light & Power Company, a corporation, against A. A. Whitley and others. On ex parte application for a temporary injunction. Application denied.

James B. Howe, of Seattle, Wash., and Clinton W. Howard, of Bellingham, Wash., for plaintiff.

NETERER, District Judge. The plaintiff moves the court, ex parte, on its complaint and sustaining affidavits, for a temporary injunction—

"enjoining the defendants, * * * and all persons whomsoever combining or confederating with them, * * * for the purpose of carrying out the same objects and interfering with the plaintiff, from interfering with the employés of the plaintiff in the operation of the plaintiff's street cars in the city of Seattle, their families, relatives, and associates, and from interfering in any manner whatsoever with any property of the plaintiff; from picketing, by means of violence, by intimidation, opprobrious epithets, and from doing any of the acts complained of in the complaint; * * *" and "that the court forthwith appoint, or cause to be appointed, a sufficient number of United States marshals to protect the employés of the plaintiff and the plaintiff in the operation of the plaintiff's street cars in the city of Seattle, and in the preservation of the plaintiff's property, and also such as shall be sufficient to protect all of the plaintiff's employés from any of the acts by the defendants or any other persons complained of in the complaint."

The motion was presented day before yesterday at 12:30 p. m., at the time the court suspended for luncheon. During the lunch hour the bill of complaint and supporting affidavits were cursorily examined. On the convening of court, at 2 p. m., the matter was taken up, at which time the court stated that it appeared that the relief demanded was executive rather than judicial, and that the matter of law enforcement was a matter for the executives of the city and the state, and a responsibility which the court should not be asked to assume. Counsel requested permission to present authorities in support of their position, which was granted. At the conclusion of the argument in the motion to remand in the case of State ex rel. City of Seattle v. Puget Sound Traction, Light & Power Co., at 3:30 p. m. yesterday, the matter was again called to the court's attention, and the following authorities cited: Sailors' Union of the Pacific v. Hammond Lumber Co., 156 Fed. 450, 85 C. C. A. 16; Tri-City Central Trades Council v. American Steel Foundries, 238 Fed. 729, 151 C. C. A. 578; John Bogni v. Govannia Perotti, 224 Mass. 152, 112 N. E. 853, L. R. A. 1916F, 831; American Steel & Wire Co. v. Wire Drawers' & Die Makers' Unions (C. C.) 90 Fed. 598 and 608; Gompers v. Buck's Stove & Range Co., 221 U. S. 418, at 439, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Stephens v. Ohio State Tel. Co. (D. C.) 240 Fed. 759.

It is strongly urged that this court can afford the remedy to settle the strike now pending on complainant's lines in the city of Seattle, and that the orders of this court would be obeyed, and that, if the order is not granted, the parties could not be responsible for the consequences.

This court has never hesitated to issue any or all orders or decrees which in good conscience should be granted. It has not, nor does it now, shirk responsibility. The decrees of courts are respected be-

cause they are issued, or should be issued, only when it is clearly es-tablished in the mind of the chancellor that the property rights of the complainant are being violated by the parties charged.   In Alaska S. S. Co. v. Longshoremen's Ass'n (D. C.) 236 Fed. 964, called to the court's attention, plaintiff was clearly in the right, and it was apparent that the court and the parties understood each other.   In the jitney case, presented a few days ago, it was made clearly to appear that the franchise rights of the plaintiff were infringed upon, and the order of the court was immediately obeyed, and the hope is indulged that the parties in that case understand each other.

[1] The right to employ labor, and the right of labor to be employed is inherent and universally recognized by the courts, and emphasized by Judge Gilbert in Sailors' Union of the Pacific v. Hammond Lumber Co., supra; and, as stated in the Longshoremen's Case, supra, 236 Fed. at page 970:

"It is not unlawful for persons to combine merely to regulate their own conduct with relation to legitimate competition, although others may be indirectly affected thereby.   The right of property and liberty of action is guarantied by the Constitution of the United States to every citizen of this country, and is not confined to political rights, but extends to activities in and about the daily business of life, whether it be of employé or employer.   The laborer may organize for protection, and his privilege to work for whom and when he desires is granted, and the right of the employer to employ whom he elects at a satisfactory price is not denied, and neither can secure more, and must not accord less."

And at page 969 of 236 Fed. it is said:

"Organized labor is organized capital, consisting of brains and muscle, and has as lawful a right to organize as have the stockholders and officers of corporations who associate and confer together with relation to wages of employés or rules of employment, or to devise other means for making their investments more profitable.   Organized labor and organized capital have equal lawful rights to associate, consult, and confer with relation to wages and rules of employment."

Justice Lamar, in Gompers v. Buck's Stove & Range Co., 221 U. S. 418, at page 439, 31 Sup. Ct. 492, 497 (55 L. Ed. 797, 34 L. R. A. [N. S.] 874), said:

"Society itself is an organization, and does not object to organizations for social, religious, business, and all legal purposes.   The law, therefore, recognizes the right of workingmen to unite and to invite others to join their ranks, thereby making available the strength, influence, and power that come from such association."

The employé and the employer each have their functions, their respective duties and obligations.   Neither may trangress the right of the other, and a court of equity will not be moved unless the rights of one of the parties are violated, or, by the conduct of one or both of the parties, the interests of the greater party, the public, which is always the sufferer during a strike, needs the court's strong arm.   The court may not be used as a strike-breaker by either party, by withholding from one party orders or decrees to which it is clearly entitled, or granting orders ex parte, where it is not made clearly to appear that the rights of the complainant are being infringed by the defendants.

Judge Hammond used this language on page 603 of 90 Fed., American Steel & Wire Co. v. Wire Drawers' & Die Makers' Unions, supra:

"Nor do I overlook the forcible argument and suggestion of counsel that practically, in a case like this, a preliminary injunction ends the strike. If you 'break the strike' by a preliminary injunction, it is urged, there is nothing more to litigate about. This may be true if the strike be then wholly abandoned, but otherwise it is not true, and its chief force is in the grave duty imposed on the court of careful consideration to see that no preliminary or other injunction issues unless according to the law and right of the case. That responsibility is not oppressive in its weight, as it should not be, for the reason that no court can or should shirk it, whatever others may be allowed to do in other branches of governmental action, but is always felt alike in all cases as a potential inducement to careful judgment, whether at the final hearing or on interlocutory application. Yet a court is not 'a strike-breaker,' as one of the affiants has been denominated, and is not engaged in that business, as such, whether it be a state or federal court, and its duties are not properly to be administered on any such suggestion. If that should be the effect of a preliminary injunction, or of a final decree, for that matter, it is only because the defendants voluntarily will have it so, and prefer to abandon all rightful action in maintaining their organized strike, because they cannot act wrongfully, or, at least, cannot do those things which are pronounced wrongful by the courts. But for that abandonment the courts are in no wise responsible; nor should that fact influence its judgment. What is really the outcome of the argument, in its logical effect, is that, if strikers cannot decide for themselves what is right and what is wrong, they must abandon the strike. But it is apparent, on a moment's reflection, that no class of the community has, can have, or should have that power. Strikers would be, indeed a favored class if it were conceded to them. And happily, they do not ask it, but yield cheerful and ready obedience to the law as declared by the courts."

[2] This court has jurisdiction when diversity of citizenship appears, and the amount involved is in excess of $3,000, and property rights of the complainant are invaded.

[3] At the time that this matter was briefly presented to the court, I was impressed with the fact that this petition should be presented to another tribunal. A careful reading of the complaint and affidavits confirms that conclusion. The duties of the court are judicial, and not executive or administrative, except as an incident. The evil complained of, as it appeared to me, was the assembing of a large number of persons who are not parties to this action, and the doing by them of some untoward acts towards the street cars of the complainant, these defendants not being directly charged with such conduct, and that the remedy needed was police protection and not the aid of the equitable arm of this court; and that this court cannot undertake to govern this city or this part of the state by injunction, and should not direct the United States marshal to man the cars of the complainant, covering a railway system in the city of Seattle of 200 miles; and the court will take judicial notice of the fact that a strike is pending in the city of Tacoma on the street railway system which is under the same general supervision, and that strikes are pending likewise in many other industrial concerns in the Pacific Northwest; and, if this court would require the marshal to police the street cars, might it not, by the same token, be required to police every shinglemill, sawmill, logging camp, or industrial concern within the district, where the parties concerned may be citizens of another state or country. There is a vast difference between protecting the property of

a nonresident against the depredations of an individual or an association of individuals who are directly engaged in damaging or destroying the property of another, and the conduct of a large number of persons associating in a public place, whose purpose may be to invade the rights of another, but who may not be directly charged with particular or specific acts. A line of demarcation must be made between the conduct of an individual or association of individuals engaged in a specific purpose or object, and the conduct of a large number of persons, sometimes denominated, and in the complaint referred to, as a "mob." As against the one application may be made to the court, and, in the exercise of sound discretion, be afforded relief. But the other clearly comes within the police power of the city, state, or nation.

An examination of the bill of complaint and the supporting affidavits in this case discloses that there are 89 persons named as defendants. It is alleged that the complainant is a Massachusetts corporation, the owner of many franchises in the city of Seattle, set out by title; that a certain dispute has arisen between the employés of the plaintiff and the plaintiff company. It is further alleged that:

"In accordance with the following provision of the plaintiff's franchises under which the street railways herein mentioned were constructed, maintained, and operated, to wit: 'That if any dispute shall at any time arise between the said grantees, their successors or assigns, and their employés, as to any matter of employment or wages, such dispute shall be submitted to arbitration. The grantees, their successors and assigns, and their employés, shall be parties to any submission, and shall be entitled to be heard by the arbitrators, and any award, when made, shall be binding and conclusive, for the period of one year from its date upon the grantees, their successors and assigns, and upon their employés.'"

That a request was made by the employés for arbitration, and said request was acceded to by the plaintiff and arbitrators appointed, but that the strike followed notwithstanding such agreement to arbitrate, and nothing was done thereunder. It is further alleged that the plaintiff then sought other employés; that on the morning of the 20th of July plaintiff applied to the mayor of the city for protection, and "that the mayor announced that such protection would be given to the plaintiff's employés and to the property of the plaintiff"; that plaintiff attempted to resume operations by starting two cars, upon each of which cars were two policemen, in the business section of the city, and when the cars were operated they were immediately attacked by a large and threatening mob, the windows of the cars were broken, missiles were hurled into the cars, and the lives and limbs of the plaintiff's employés were endangered, and such operators denounced as "scabs"; that a number of policemen refused to give any protection to the plaintiff's employés or the plaintiff's property, and some of the policemen were stripped of their authority by their sergeant; that—

"one of the police officers upon one of plaintiff's cars cursed plaintiff's operators of the car upon which he was riding, denounced them as 'scabs,' and refused to give any protection, and a number of policemen so detailed mutinied and refused to assist in protecting plaintiff's employés and plaintiff's property. The cars, owing to the violence of the mob, were prevented from being oper-

ated as had been intended, and were returned to the car barn. A great and threatening crowd gathered around the car barn, which was protected by a small number of policemen, and plaintiff was advised by the police officer in command not to resume operations until he received additional reinforcements. * * * Plaintiff again applied to the mayor of Seattle for police protection, and on the 21st inst. plaintiff again resumed operation of its street cars upon one of its lines. A great mob attacked the car, threw the trolley from the wire time after time, the windows of the car were smashed, the car wrecked, and the operators badly beaten. The mayor, the police department, and the police endeavored faithfully to protect the employés of the plaintiff and the plaintiff's property, but were unable to cope with the mob, and the car was returned to the car barn. The violence of the mob was such that it was impossible for the plaintiff to give any further service upon its street railway lines, and, while the mayor of the city and many of the policemen have endeavored to give the protection promised the plaintiff, they were unable to cope with the situation."

It is further alleged that:

"The former employés of the plaintiff who left plaintiff's employment and refused to operate the plaintiff's street railway system are all citizens and residents of the state of Washington and of King county, and some of these men combined and conspired with other citizens and residents of the state of Washington and of the city of Seattle to forcibly prevent the resumption by plaintiff of street railway service in the city of Seattle upon the lines of the plaintiff. The plan of such combination and conspiracy was to congregate around the car barns of the plaintiff, and, by threats, violence, intimidation, and opprobrious epithets, to deter new employés of the plaintiff from entering such car barns and starting street cars therefrom over the street railways of the plaintiff in the city of Seattle, and to join with numerous other citizens of the state of Washington, when such cars should leave such car barns and operate over the tracks of the plaintiff, to wreck such cars, remove the trolleys from the wires, assault and strike the operators operating such cars, denounce them as 'scabs,' apply various other opprobrious epithets to them, surround such cars with a mob, overpower the police detailed to give protection, and destroy such cars, and pursuant to such plan the defendants named in this complaint and many other persons, citizens and residents of the state of Washington, did, on the 20th and 21st days of July, 1917, commit, act, aid and assist in the commission of the wrecking of the plaintiff's cars, beating the plaintiff's employés operating the same; * * * "

—and that the defendants and numerous other persons, citizens of the state of Washington, whose names to the plaintiff are at the present time unknown, will continue to carry out the combination and conspiracy by force. It alleges that plaintiff has taken steps to employ competent street car operators who will be ready and willing to operate the street cars of the plaintiff in the city of Seattle, as soon as they can obtain protection, so that in the operation of such cars they will not be in danger of being killed or maimed by the defendants and certain other citizens of the state of Washington, who have combined with the defendants to prevent the operation of such cars, and who, unless enjoined by this court and prevented by officers acting under the authority of this court, will attack such operators of the cars of the plaintiff and kill and maim them and destroy the street cars which they attempt to operate. It is then alleged that:

"The defendants and certain other citizens of the state of Washington who have combined with them to prevent the operation of the plaintiff's street cars in the city of Seattle as hereinbefore set forth, have, pursuant to their combination and conspiracy, adopted the plan of notifying by telephone some of the

faithful employés of the plaintiff, and the families of such employés, that such employés will be killed if they remain faithful to the plaintiff, and they continue to make threats to the families of such faithful employés for the purpose of breaking down the moral courage of such employés and their families, and for the purpose of terrorizing their families, hoping thereby to compel such employés to leave the service of the plaintiff. As part of the same combination and conspiracy the defendants, acting through certain of their agents and confederates, have prevented the delivery of provisions and other supplies to the car barns of the plaintiff, using force and violence for that purpose, with the object of preventing the plaintiff from provisioning its employés at such barns, and the defendants and their confederates will, unless enjoined by the court, continue to telephone threats and to do such acts for the purpose of terrorizing the families of the plaintiff's employés and starving out such employés of the plaintiff at its car barns and other places where such employés are and may hereafter be located; * * *" and that "the defendants will also continue to picket the car barns and property of the plaintiff for the purpose of preventing ingress and egress from such property by the employés of the plaintiff and those seeking employment, and such picketing will not be conducted peaceably, but will be carried on with threats, opprobrious epithets, applying the word 'scab' to the employés of the plaintiff and those seeking employment; * * *" and that "the inability of the authorities of the city to control such mob and the defendants, and to prevent the maiming of plaintiff's employés and the destruction of plaintiff's street cars while such employés were carrying out their duty to operate the street car system, the threats, intimidation, and violence of the defendants and of the mob, have demonstrated that it will be necessary for the protection of the employés of the plaintiff and the property of the plaintiff, in the operation of its street cars, that a sufficient number of United States marshals should be appointed to prevent the plaintiff and its employés from being deprived of their constitutional rights, and to protect the employés of the plaintiff from being killed or maimed. * * *"

The supporting affidavit of E. J. McIlraith says:

"The crowd around were hurling stones. * * * The crowd was composed of striking employés, their sympathizers, and others. * * * The crowd was hurling missiles, * * *" etc.

"The crowd had pulled the trolley from the wire."

"The crowd at that point was growing rapidly, and was made up of striking employés, sympathizers, and others."

"The crowd which was beginning to fill the streets from building to building from the south side of Jackson north toward Washington."

No reference is made in this affidavit to any defendant named in the complaint, but all reference is to untoward acts of the crowd, striking employés, or sympathizers.

Hedlund's affidavit refers to the persons as striking employés, with their sympathizers, and other people, and "mob." On page 4 he states:

"Affiant particularly mentions as one actively participating in and encouraging the demonstrations occurring on the 21st day of July, 1917, aforesaid, one B. H. Moffett; that affiant mentions as particularly active in the picketing at said North Seattle Car Barn, heretofore mentioned in this affidavit, E. H. Davey and Neil McDonald."

Worthen, in his affidavit, refers to the "mob," and states (page 2):

"That immediately after throwing the said switch a number of striking employés of plaintiff and their sympathizers rushed into the street and kicked the switch back again; that thereupon the trolley on said street car was pulled off by said mob, or members of it, said mob, according to affiant's judgment, aggregating at least five thousand people. * * *"

On page 3 he further says:

"Said mob aggregating, in affiant's judgment, at least five thousand people."

And later on the same page:

"Said mob at that time, according to affiant's judgment, being composed of at least ten thousand people."

At the close of the affidavit:

"Affiant states that E. H. Davey and D. H. Moffett have been active in picketing heretofore referred to as occurring at the North Seattle Car Barn;" and "particularly in this, that said D. H. Moffett has been active in aiding and fomenting said 'mob.'"

There is no statement in the complaint or any of the supporting affidavits charging any one of the defendants with any act of destruction of complainant's property. There are statements as former employés (there are many former employés who are not defendants), and general statements that "defendants and numerous other persons" are doing acts "pursuant to their combination and conspiracy," but nowhere is a single fact stated which is attributed to any one of the defendants in the complaint upon which the conspiracy is predicated, or any statement which could be attributed collectively to the defendants, or as emanating from a co-operation or confederation on the part of the defendants; nor is the name of any of the defendants mentioned in the body of the complaint, nor in the supporting affidavits, except the names of Moffett, Davey, and McDonald, mentioned in two of the affidavits, and these three defendants are charged with being "active in the picketing at said North Seattle car barns"; and in one affidavit, "particularly in this, that said D. H. Moffett was active in aiding and fomenting said mob." Nor is there any allegation that the picketing that is carried on is not peaceable and in accordance with the provisions of the Clayton act (Act Oct. 15, 1914, c. 323, 38 Stat. 730). There is the allegation that "picketing will not be done peaceably," but no act is charged as the basis for the conclusion for future conduct.

In the absence of such statements, in view of the general charges made and the specific designation of 3 defendants out of 89, the court must conclude that full disclosure was made of known conduct of the defendants. The defendants are not charged as a society or company acting through recognized heads and leaders, with delegated authority received from the defendants. If the defendants were engaged in peaceable picketing, that is recognized by the Clayton Act, which must control the act of this court. If the defendant Moffett was engaged in fomenting the "mob" and creating a riot, he is amenable under the criminal laws of the state, and complaint should be filed with the public prosecutor, and if the affidavit presented is true, with relation to the number of people assembling when the untoward acts charged were done, then, decidedly, this is not a matter for a court of equity to dispose of, but for other departments of the government, and should be presented, if it has not already been, to the proper department, where I have no doubt it will receive consideration.

These parties are not charged with interfering with interstate commerce or United States mail, the enterprise of the complainant being entirely local.

It is needless for this court to say that it is to be regretted, in this time of stress, in this enlightened community of patriotic citizenship, and a time when the burdens of government must be almost beyond endurance, and when the eyes of a new republic just struggling to its feet are looking to us for inspiration, and a crafty autocratic foe magnifying every semblance of disagreement into national discord, for the purpose of inspiring its discouraged soldiery to renewed and prolonged combat, and thereby requiring the sacrifice of the flower of our young manhood, that the parties may not, in the spirit of the provision of the franchise ordinances set out in the complaint and herein, arbitrate all disputes and grievances.