### STEPHENS et al. v. OHIO STATE TELEPHONE CO.

(District Court, N. D. Ohio. W. D. February 14, 1917.)

No. 166.

1. COURTS ⬅316—JURISDICTION—COLLUSION.

Judicial Code (Act March 3, 1911, c. 231) § 37, 36 Stat. 1098 (Comp. St. 1913, § 1019), authorizing the dismissal of a suit in the federal court if it should appear that it does not properly involve a dispute within the jurisdiction of the court, or that parties have been collusively made or joined for the purpose of giving the court jurisdiction, does not deprive the federal court of jurisdiction over a suit by the subscribers of an interstate telephone company whose employés were on a strike, to compel the company to furnish the service it had contracted to furnish, though the parties thereto were friendly antagonists, and the telephone company was willing to have the controversy submitted to the federal court, since the collusion which deprives the court of jurisdiction is not an agreement between the parties that an existing dispute cognizable in the federal courts shall be brought there, but an agreement so to adjust the situation as to clothe the court with an apparent jurisdiction which it otherwise would not have.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 862.]

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. EQUITY ⊘═48—ADEQUATE REMEDY AT LAW.

Under Judicial Code, § 267 (Comp. St. 1913, § 1244), providing that suits in equity shall not be maintained in the federal courts where a plain, adequate, and complete remedy may be had at law, the fact that each one of a large number of subscribers of an interstate telephone company might have an adequate remedy at law for the interruption of the service which he contracted for does not prevent a suit by several subscribers, on behalf of all, to compel a restoration of the service, since, while the several actions at law were being tried, the suspension of service would continue, and might reach the proportions of a public calamity.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 156, 158.]

3: EQUITY ⊘═48—ADEQUATE REMEDY AT LAW—MANDAMUS—STRIKE.

Where a telephone company's service was being interrupted during a strike by acts of unknown individuals, the remedy of subscribers by mandamus to compel a restoration of the service is not sufficiently speedy, and is inadequate, since it cannot reach the wrongdoers whose acts caused the interruption of the service, and therefore such remedy does not prevent a suit in equity.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 156, 158.]

4. COURTS ⊘═289—JURISDICTION—INTERSTATE TELEPHONE COMPANY.

Under Act June 18, 1910, c. 309, § 7, 36 Stat. 544 (Comp. St. 1913, § 8563), amending Interstate Commerce Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379, so as to make it apply to telephone, telegraph, and cable companies engaged in sending messages from one state, territory, or district to another or to a foreign country, which companies shall be common carriers within the act, the federal courts have the same jurisdiction relating to a telephone company's duties as an interstate agency that they have relating to railroads and other interstate carriers.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 830.]

5. COURTS ⊘═289—JURISDICTION—CONTROVERSY UNDER LAWS OF UNITED STATES—INTERSTATE TELEPHONE SERVICE.

Under Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379, as amended in 1889 (Act March 2, 1889, c. 382, 25 Stat. 855) and 1910 (Act June 18, 1910, c. 309, 36 Stat. 544), interstate telephone companies are required to furnish reasonable facilities for the transaction of their business, and that duty may be enforced by a proceeding in equity in the United States courts as a controversy arising under the laws of the United States.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 830.]

6. CONSTITUTIONAL LAW ⊘═70(1), 72—COURTS—JURISDICTION—LEGISLATIVE OR ADMINISTRATIVE ACTS.

A suit by the subscribers of an interstate telephone company, to require it to repair its appliances and thereafter to keep them in a good state of repair and in condition for operation, is not beyond the jurisdiction of the court, as asking the court to undertake administrative or legislative functions.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 129, 132, 133, 137.]

7. INJUNCTION ⊘═101(3)—STRIKE—UNLAWFUL ACTS—"LAWFUL."

Within Clayton Act Oct. 15, 1914, c. 323, § 20, 38 Stat. 738, providing that no injunction in any case between employer and employés shall prohibit any persons from terminating the relation of employment, or from recommending or persuading others by peaceful means so to do, or from attending at any place where they may lawfully be for the ·purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or abstain from work, or from ceasing to patronize or employ any party, the test whether the act is lawful is the question whether it would be lawful if no strike existed, and no action having in it the element of intimidation, coercion, or abuse, physical or

⊘═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

verbal, or of invasion of rights of privacy, nor any act or speech which a fair-minded man may reasonably judge to be intended to convey insult, threat, or annoyance to another, or to work abuse upon him, is lawful.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 174, 175.

For other definitions, see Words and Phrases, First and Second Series, Lawful.]

8. INJUNCTION ☞101(2)—STRIKE—INTERFERENCE WITH PUBLIC UTILITIES.

Striking employés of a telephone company, which is a public utility whose first duty is to serve the public, cannot lawfully interfere, under the Clayton Act, with the business of the company, if it can find people willing to work for it, since, if it can find laborers, it must employ them and fulfill its public duties.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 175.]

9. CONSTITUTIONAL LAW ☞82—PERSONAL RIGHTS—EXTENT.

Individual rights are and must be subordinated to the public good.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 149.]

10. INJUNCTION ☞204—CERTAINTY—PICKETING BY STRIKERS.

An injunction issued in a suit by the subscribers of a telephone company whose employés were on a strike, to compel the company to perform its contracts, which restrained all persons from doing any act which may interfere in any respect with the performance of those duties, is, in view of the fact that the interests of the public are paramount to the interests of the strikers or the employers, as definite as it could be made and be effective, and complies with Clayton Act, § 19, providing that, in any case between employers and employés, an injunction should specify in reasonable detail the things enjoined, conceding that that section applied to such a suit.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 422, 423.]

In Equity. Separate suits by A. C. Stephens and others and by the Home Telephone Company against the Ohio State Telephone Company, in which Bert Hoffman was allowed to intervene on behalf of Local 245, International Brotherhood of Electrical Workers, and its members. On motion by the intervener and other members of the union, attacking informations charging violation of the injunction issued by the court. Motions denied.

Marshall & Fraser, of Toledo, Ohio, for complainants.

L. T. Williams, of Toledo, Ohio, for defendant.

J. A. Cline, of Cleveland, Ohio, for Local 245, International Brotherhood of Electrical Workers.

H. W. Fraser, Sp. Atty., of Toledo, Ohio, for the United States.

KILLITS, District Judge. December 12, 1916, A. C. Stephens and others, each claiming a cause of action similar in character and occasion to that offered by every other, and alleging that they were suing in a representative capacity in behalf of numerous other persons similarly situated, filed a complaint in this court against the Ohio State Telephone Company, a corporation organized under the laws of Ohio, and doing business in Toledo, of which city each of the complainants is a resident.

The complaint asserts that the defendant is engaged in the business of transmission of messages to points within and without the state of

Ohio over telephone lines and cables of its own extending into neighboring states, and through its connections with other companies, and that each of the complainants, and each of the numerous persons in whose behalf also the complainants profess to act, are patrons of said telephone company, with an interest as such in the maintenance of its facilities for interstate communication by virtue of their several contracts with defendant, whereby complainants, severally, are entitled to enjoy local and long-distance telephone facilities to points within and without the state of Ohio.

It is further alleged that the defendant is obligated, by the terms of its charter and franchise for the use of the streets of Toledo, to furnish adequate facilities for telephonic communication to points in the city and within and without the state of Ohio to all persons willing to pay the fixed charges prescribed for such services by the company; that it has over 20,000 telephones connected in the city of Toledo with central exchanges by the usual and necessary wires and other constructions, and maintains a so-called "long-distance" exchange physically connected by wires and other instrumentalities to similar long-distance exchanges and central exchanges located in many cities, villages, and towns in the state of Ohio and in adjoining states, and that thereby the defendant company serves the community as an instrumentality of interstate commerce; that the defendant company has suffered and permitted its lines, cables, and other facilities to become so greatly out of repair that it is impossible for complainants to obtain and to have service for which they pay, and which defendant is obligated to furnish, and that it has become impossible for the patrons of the telephone company to have reasonably full use of the company's lines; that at 25 or more places in the city, designated in the complaint, defendant's lines and cables have become cut and are permitted to remain out of repair, to the end that over 2,500 patrons of the defendant company have been entirely deprived of telephone service, including many of the prominent manufacturing and business establishments of the city, in some of which the complainants are severally interested; that the working force of the defendant company, of operators, linemen, and repairmen, has been permitted by the company to become so depleted that it is unable to and fails to keep its lines and facilities in reasonable repair, and that the situation presents a matter of grave concern to the prosperity and well-being of the city of Toledo and its inhabitants, including the several complainants, in that the legitimate business and commerce of the city to points within and without the state of Ohio are seriously and very largely interfered with, to the very great damage of community interests; that the complainants have no adequate remedy at law, and that the defendant indicates neither ability nor disposition to comply with the requirements of the several contracts alluded to, and with the obligation to maintain adequate facilities for intra and inter state communication.

It is asked, therefore, that the company be cited to answer the bill; that a preliminary order be issued to the defendant, requiring the defendant to immediately repair and put its plants, lines, wires, and facil-

ities in reasonable order and condition for operation, and to observe its duties and obligations as an interstate carrier and as a public utility under the several acts of Congress and its contracts; and that it be determined and decreed that the rights and interests of the public and of the complainants, representing the public, are paramount in all respects to the private interests of the defendant, its officers, and employés, and all other persons whomsoever.

A few days after the filing of this complaint, a Michigan corporation, known as the Home Telephone Company of Grass Lake, filed a complaint against the Ohio State Telephone Company, alleging substantially the same condition of affairs as in the former complaint, with additional circumstances, setting forth the Michigan corporation's particular interest in the maintenance of the facilities and obligations of the local company, because the latter is the medium by which the former company maintains its interstate long-distance communication with points in the state of Ohio, and that its business in Ohio was interrupted by the failure of defendant to maintain its lines in proper repair.

Before any action was taken by the court these cases were consolidated, and thereupon the court, after notice, found that "within the past three weeks the cables of defendant company have been cut, damaged, or destroyed" at the several points set forth in the complaint, and that this situation was the result of depredations by divers persons unknown to the telephone company; that thereby followed large, but unascertainable, losses of money and business to the complainants and others and the community, and an interruption of the free flow of interstate commerce; that the defendant company should immediately proceed to the repairing of the several cables located at or about the places mentioned in the order, and should thereafter maintain and keep all other cables, lines, wires, and appliances in good state of repair and in condition for operation. Then followed this provision:

"It is further ordered, adjudged, and decreed that the defendant company, its officers, agents, servants, and employés, those in concert or participating with them, and all persons whatsoever, and particularly all persons having notice of this order, be and are hereby enjoined and restrained from interfering in any way, or in any manner, with the cables hereinbefore enumerated, or with the repair of said cables, or with workmen engaged in repairing said cables, or with employés of defendant company when in the company's service; and all said persons and parties are enjoined and restrained from doing any acts or things which may interfere in any respect with the performance of the duties and obligations of the defendant company as a common carrier."

The answer of the defendant company, filed some time after the entering of the preliminary order, admitted many of the allegations of the complaint, but, putting the complainants upon proof as to many others of important character, which need not be discussed here, set up the fact by way of excuse that it was suffering a strike on the part of its operators and linemen, and that it was having great difficulty in maintaining its working force, because its striking employés and their sympathizers were conspiring and combining to prevent the defendant from continuing in the operation of its telephone system and from employing operators, linemen, cablemen, and other electrical

workers to repair the lines upon which depredation had taken place, and from maintaining the facilities of the company in operation; that their loyal employés were subjected to intimidation, abuse, and violence; and that its cables and lines were being destroyed and cut, as charged in the complaints, by the striking employés and their sympathizers.

Prior to the coming in of this answer, however, one Bert Hoffman, representing himself as a resident of the city of Toledo, applied for leave to intervene by answer and intervening petition in behalf of himself and the several members of Local 245 of the International Brotherhood of Electrical Workers, of which he was a member, and in behalf of said union. After a finding that he did in fact sue in behalf of the said union and its members, permission was granted, and his answer and intervening petition allowed to be filed. In these admissions were made of substantially the facts set forth in the complaints, except that Hoffman denied that either he or any of the parties for whom he attempted to speak were guilty of the depredations of the lines and facilities of the defendant company. An attempt was made also in Hoffman's pleadings to raise the merits of the labor controversy between the striking employés and the company, an issue which the court has not yet considered. Hoffman's pleadings in behalf of himself and his fellows assert their intention:

"To do and perform, singly and in concert with others, by peaceful and lawful means, all acts which he is able to perform by peaceful and lawful means, to compel said company to re-employ its striking employés, and to establish fair wages and decent working conditions; that until said company shall comply with said demands of its employés this petitioner will, in every peaceable and lawful manner possible, interfere with the business of said telephone company."

The order permitting Hoffman to file his intervening petition and his answer in behalf of himself and his fellow members of the union, and of the union, contains a stipulation of his counsel, with the counsel of all the other parties to the cause:

"That the order heretofore entered in this suit upon December 14, 1916 (the temporary order above referred to), shall be and remain in full force and effect as a preliminary injunction until the further order of this court, and that said order be observed and respected in all things until the further order of this court."

After the temporary restraining order had become a temporary mandatory injunction in the language above quoted, to which all the parties consented, including the union men, as above stated, testimony was had before the court in several instances, pursuant to the last provision of section 22 of the act of October 15, 1914, commonly known as the "Clayton Act," which testimony tended to suggest violations of the provisions thereof by various parties, including Hoffman, the representative defendant himself. Attachments were issued, based upon this testimony, and subsequently informations were filed by direction of the court. The parties arrested thereon were admitted to bail in amounts of from $100 to $400, and the court has now before it the return of the several respondents to the respective informations. As the

returns raise practically the same questions in each instance, for the purpose of this opinion we will consider only that of Gustav M. Bugniazet, one of the vice presidents of the International Order of Electrical Workers, who had been in charge of the alleged strike among the employés of the defendant telephone company. The points raised by this return, which we deem worthy of special consideration at this time are:

First, the jurisdiction of the court to entertain an action attempted to be brought by patrons holding contract relations with the Ohio State Telephone Company under circumstances such as obtain here is questioned.

Second, that the terms of the injunction are too broad and indefinite to be valid under the provisions of sections 19 and 20 of the so-called "Clayton Act," which, it is insisted, exclusively control the court in this case.

Respecting the first contention, it is urged that jurisdiction is lacking because the suits are collusive, and because there is a lack of jurisdiction, on the theory that legal remedies are present, and because the court is asked to undertake administrative and legislative functions.

Respecting the second position taken by respondent, it is urged that the order attempted to restrain employés of the telephone company and persons seeking employment therewith from attending in places where they may lawfully be for the purpose of peacefully obtaining and communicating information, peacefully persuading persons to abstain and cease working for the telephone company, and from doing acts which might lawfully be done in the absence of such dispute concerning terms and conditions of employment, contrary to the provisions of section 20 of the Clayton Act, and that the order did not describe in such reasonable detail the act or the acts of the parties to be restrained, as provided by section 19 of the so-called "Clayton Act."

[1] In argument it is urged with considerable insistence that the court has before it a case squarely within the provisions of sections 19 and 20, and particularly the latter, of the act of October 15, 1914. There is no evidence of collusion between the parties in this case; that the original parties may be friendly antagonists is not, however, improbable. Counsel's surmise may be correct, but something more than this is necessary to make their "collusion" reprehensible. The court will not concern itself with the fact, if it exists, that the parties to the cause have agreed to submit their alleged controversy to this court; if there is nothing in substance to support the theory of collusion, other than that, the fact is of no consequence. Provided a real controversy between the parties exists, and the same elements of jurisdiction obtain as if the action were forced upon the defendant by the plaintiff, the court will not inquire into the reason why the parties to the cause entered into an agreement, if they did, to bring their action in this court in any form. Ashley v. Board of Sup'rs of Presque Isle County, 83 Fed. 534, 27 C. C. A. 585; Lehigh Mining & Mfg. Co. v. Kelly, 160 U. S. 327, 16 Sup. Ct. 307, 40 L. Ed. 444; In re Metropolitan Railway Receivership, 208 U. S. 90, 110, 111, 28 Sup. Ct. 219, 52 L. Ed. 403. It is when the collusive agreement extends to an

adjustment of the situation, so as to apparently clothe the court with jurisdiction which it otherwise would not have, that it becomes obnoxious, so that the real inquiry here is the inquiry as to jurisdiction upon the facts alleged, and if it is found that the court is asked to consider a cause of action which exists as one within its jurisdiction, no matter what the parties thereto determine to do with it, we are not interested to ask why they presented it to this court. Section 37 of the Judicial Code is addressed to that form of collusion which is entered into "for the purpose of *creating* a case cognizable" under the Code. The statute is not new; it was the law under consideration in the cases cited, and it is not understood to refer to an agreement to submit a real controversy over facts not of the making of the alleged colluding parties, but to the collusive establishment, for the purposes of a suit, of facts in controversy which otherwise would have had no existence.

[2] Counsel first insist that the complaints present no cause of equitable cognizance, because the complainants have a complete and adequate remedy at law; wherefore, under favor of section 267 of the Judicial Code, this suit is not sustainable. It is suggested that each of the complainants might find relief through·appeal to the Interstate Commerce Commission, or through appeal to the Ohio State Utilities Board, or in an action for damages, or by an action in mandamus. Assuming, for the sake of arguing counsel's position, that any individual complainant might have a remedy at law through one of the methods suggested, still that mere fact does not suffice to make the situation here unrecognizable in equity. It is a *complete and adequate remedy at law*, only, which will oust equitable jurisdiction. The Supreme Court, in Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341, announced the rule as follows:

"This court has repeatedly declared in affirmance of the generally accepted proposition that the remedy at law, in order to exclude a concurrent remedy in equity, must be as complete, as practical, and as efficient to the ends of justice and its prompt administration, as the remedy in equity. * * * Where irreparable injury is threatened, or the damage be of such a nature that it cannot be adequately compensated by an action at law, or is such as, from its continuance, to occasion a constantly recurring grievance, the party is not ousted of his remedy by injunction."

The condition which complainants picture is one which affects not only each one of them individually, but which affects the entire public. It is obvious, assuming that the complaints state the truth, that an extension of the damage done to the properties of the defendant company in any material degree beyond what is stated in the complaints would approximate a public calamity, if that state of affairs does not already exist. While each individual complainant was carrying his complaint through the slow processes of any legal remedy, whichever one of those enumerated by counsel for respondent should be chosen, an intolerable public situation would remain and doubtless be enhanced in its calamitous features.

[3] Assuming that any one of the complainants might be compensated for his damages in an action at law, while he was having those damages ascertained, following legal procedure, they would be continuing and increasing, not only as to him up to the day of trial, but as to

every contract holder of the company, for his contract would entitle him to service with every other contract holder. While the alternative rule in mandamus was running, if one should be granted, which would be, of course, only against the defendant company, there would be no restraint upon the continuing action of irresponsible people who were placing the company at the mercy of an order in mandamus. No remedy at law would be possible, either, against probable, but then unknown, wrongdoers. Some of the remedies suggested involve of necessity a multiplicity of suits, which, when brought, would be effective only touching the particular actions, and would not reach recurring conditions, involving new causes of action. Even if there were remedies at law available to complainants, individually or collectively, or to the public, it is very plain that none was adequate to meet this situation, for no remedy had in it that celerity and comprehensiveness of operation which mark an injunction order, and which such a situation as this required in order that there may be any adequacy at all in the remedy. While the public, represented by complainants, was awaiting the necessarily slow processes of law, where would the public service have been? The futility of a resort to any suggested legal remedy to meet the situation alleged in the complaints is too plain to need any further argument.

[4] In 1910 (Act June 18, 1910, § 7) the Interstate Commerce Act of 1887, and subsequently amended, was further amended to the effect that:

"The provisions of this act shall apply to * * * telegraph, telephone and cable companies (whether wire or wireless) engaged in sending messages from one state, territory, or district of the United States to any other state, territory, or district of the United States, or to any foreign country, who shall be considered and held to be common carriers within the meaning and purpose of this act."

It seems to be clear that the purpose of Congress in this enactment was to classify such corporations as the defendant here, for all purposes so far as the administration of the laws of the United States is concerned, with railroads and other transportation common carriers, for the laws pertaining to interstate commerce, while generally providing for matters of administration of the duties of instrumentalities of interstate commerce towards the public, yet comprehensively bring them within the jurisdiction of the federal courts for all purposes relating especially to their duties as interstate agencies. We cite this act, therefore, to the point that all decisions touching the jurisdiction of the federal courts under the laws relating to interstate commerce are applicable to situations arising with reference to telephone and telegraph companies, and that we may assimilate controversies respecting interstate traffic by telephone and telegraph with those which deal with transportation of goods and persons.

[5] It probably would not be disputed, at least it is not subject to dispute, that the acts of Congress regulating interstate traffic are intended to, and do, so far as it is possible for mere enactments to accomplish anything, secure to the public the effective performance of the duties imposed upon public utilities by virtue of their contracts and

those public engagements which result from their franchises. It was long ago held by the declaration of the Supreme Court that telegraph lines, when extending from state to state, were instruments of commerce under the protection of section 8 of article 1 of the Constitution—the commerce provision—and that messages transmitted over such lines from one state to another constitute interstate commerce. Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U. S. 1, 24 L. Ed. 708; Telegraph Co. v. Texas, 105 U. S. 460, 26 L. Ed. 1067; Western Union Telegraph Co. v. Pendleton, 122 U. S. 347, 7 Sup. Ct. 1126, 30 L. Ed. 1187. It has also become the settled law by adjudication, as well as in many states by statutory enactment, that for all purposes respecting the rights of the public a telephone company must be treated in the same manner as a telegraph company. The federal act of 1910, cited above, is effective also to that end.

The several sections of the Interstate Commerce Act, as enacted in 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 379), and amended in 1889 (Act March 2, 1889, c. 382, 25 Stat. 855) and 1910 (Act June 18, 1910, c. 309, 36 Stat. 544), require telephone companies to afford all reasonable facilities for the transaction of business for which they are chartered and which they engage to carry on through their contracts, and subject them, as in case of other instrumentalities of interstate traffic, to heavy penalties for failure to comply with these obligations. As we read the statutes, the same law and procedure are applicable to them which safeguard public and private interests in the operation of any other business engaging in interstate commerce, and we find the jurisdiction of the federal courts over analogous controversies upheld by a long line of decisions touching so great a variety of phases of dereliction that we may safely say we have here one belonging to the same category. We cite: Chicago, B. & Q. Ry. Co. v. Burlington, C. R. & N. Ry. Co. et al. (C. C.) 34 Fed. 481; Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co. et al. (C. C.) 54 Fed. 730, 19 L. R. A. 387; Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co. et al. (C. C.) 54 Fed. 746, 19 L. R. A. 395; Wabash R. Co. v. Hannahan et al. (C. C.) 121 Fed. 563; Sunderland Bros. et al. v. Chicago, R. I. & P. Ry. Co. et al. (C. C.) 158 Fed. 877; Northern Pac. Ry. Co. et al. v. Pacific Coast Lumber Mfrs.' Ass'n et al., 165 Fed. 1, 91 C. C. A. 39; Cleveland, C., C. & St. L. Ry. Co. v. Hirsch, 204 Fed. 849, 123 C. C. A. 145; Alaska S. S. Co. v. International Longshoremen's Ass'n of Puget Sound et al. (D. C.) 236 Fed. 964; In re Lennon, 166 U. S. 548, 17 Sup. Ct. 658, 41 L. Ed. 1110; Western Union Telegraph Co. v. James, 162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105; Southern Railway Co. v. Tift, 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124, 11 Ann. Cas. 846; Macon Grocery Co. v. Atlantic Coast Line Railroad Co., 215 U. S. 501, 30 Sup. Ct. 184, 54 L. Ed. 300; Louisville & Nashville Railroad Co. v. F. W. Cook Brewing Co., 223 U. S. 70, 32 Sup. Ct. 189, 56 L. Ed. 355; United States v. Pennsylvania Railroad Co., decided December 11, 1916, 37 Sup. Ct. 95.

Extended comment upon these cases is unnecessary. We may note, however, that in the Tift Case, 206 U. S. 428, 27 Sup. Ct. 709, 51 L. Ed. 1124, 11 Ann. Cas. 846, the court held that, although an action

at law for damages to recover unreasonable rates existed, the federal court could entertain a bill in equity to restrain the enforcement of an unreasonable schedule of rates; and in the case last cited, (United States v. Pennsylvania Company) it was held that the Interstate Commerce Act does not give the Interstate Commerce Commission power to direct a railroad company to provide reasonable facilities for service, that is, that the act does not give the Commission the power to enforce the provision that "it shall be the duty of every carrier * * * · to provide and furnish such transportation upon reasonable requests therefor," but that such power is lodged only in the courts. See Pa. R. Co. v. U. S. (D. C.) 227 Fed. 911. So, also, in the Beer Case, 223 U. S. 70, 32 Sup. Ct. 189, 56 L. Ed. 355, it was held that the refusal of a common carrier to accept a certain class of freight did not give rise to an administrative controversy within the jurisdiction of the Interstate Commerce Commission, but created a question to be determined only by a court. The criterion is the presence of a controversy arising under the laws of the United States. We feel that we are entirely justified upon this current of authority in holding that we have such a controversy here.

[6] As the court is not asked to perform an administrative act, so we are unable to see with counsel that it is asked "to legislate and fix the quality of service required to be given by the defendant company, not only that the present service is inadequate, but as fixing the standard of service which will be required of the company." We see no application to the instant situation of any of counsel's authorities on this subject. It seems to us that this is plain from a consideration of the order issued, which follows the prayer of the complaint, and which reads in its material parts as follows:

"The court finds that within the past three weeks the cables of defendant company have been cut, damaged, or destroyed at the points hereinafter set forth, and that by reason thereof telephones of defendant company, which are instrumentalities used and useful in interstate commerce, have been rendered inoperative and that complainants, being directly interested in certain of said cables and telephones, and appearing herein on behalf of all persons interested, are entitled to have said cables immediately repaired and to have service thereon immediately re-established. * *· * It is therefore ordered, adjudged, and decreed that the defendant company shall immediately repair all its cables located at or near the following places: [Here follows a description of points where repairs are imperatively needed as alleged in the complaint.] * * * It is further ordered, adjudged, and decreed that the defendant company shall immediately repair all other cables, lines, wires, appliances, and facilities of the defendant, and that it shall keep and maintain all said property in a good state of repair and in condition for operation."

Other parts of the order are either injunctional or findings of facts. The order itself is sufficient answer to all of counsel's argument. Such an order would be clearly within the power of a court in mandamus proceedings, and if it could be issued at law, in a case of this kind where mandamus, by reason of procedure and because of continuing conditions, is a cumbersome and inadequate remedy, it could be granted by a court of chancery.

It is contended that, although this suit was instituted by patrons of the company against the company only, it is squarely within section 20 of

the Clayton Act, which enacts certain limitations upon the power of fed-eral courts "in any case between an employer and employés, or between employers and employés, * * * or between persons employed and persons seeking employment," involving a labor controversy. This contention will occupy here none of the court's time. It is at present of no consequence to consider whether this section 20 should be construed to govern cases not within the exact terms of its limitations. If this portion of the act presents the novel features claimed for it, it may well be argued that it is therefore class legislation, which, if valid all, must be construed narrowly; but respondent's motion to the information against him may be disposed of to a better purpose if we assume, with his counsel, that the Clayton Act applies in every section to this controversy, it being understood, of course, that the court is not deciding the point, but joins with counsel in the assumption, because, if section 20 of the act does not apply, respondent's case is hopeless.

The fact that Local 245 of the International Brotherhood of Electrical Workers was permitted to intervene through the representations of Hoffman must not be taken as indicative that the court finds the case to be under section 20. The question still remains whether the issue that now appears between the complainants and the union is under the Clayton Act. Without extended comment, we hold that an "irreparable injury * * * to a property right, of the party making the application, for which * * * there is no adequate remedy at law," is involved in this case, to prevent and abate which the action is brought. As clearly we must hold, also, that that is described "with particularity in the application." Argument to the contrary seems to us to be mere effusive verbality.

[7] The second paragraph of section 20 we quote in full as the important one. It has sometimes been called "Labor's Bill of Rights." We may as well call it an "Employer's Bill of Rights," and also, when there is a labor controversy involving a public utility as here, the "Public's Bill of Rights." The "rights" guaranteed by it to the employés, "in any case between employer and employés," are to be set up against and limited by the certain "rights" of the employer therein written. He has just as much right, under this section, that his employés shall not exceed the limits of their rights under it as they have to enjoy them. The rights of the employer begin where those of the employés stop. The granting of a "right" by statute always involves an obligation upon the favored one not to exceed its limitations. The act says:

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by *peaceful* means so to do; or from attending at any place where any such person or persons may *lawfully* be, for the purpose of *peacefully* obtaining or communicating information, or from *peacefully* persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by *peaceful* and *lawful* means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a *lawful* man-

ner, and for *lawful* purposes; or from doing any act or thing which might *lawfully* be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

It is well to note, and not to lose sight of, the fact that the words "lawfully," "peacefully," "lawful," "peaceful," dominate the thought of the second paragraph of the section in question; they control its meaning, as they control both the court and the parties to a labor controversy. The statute but enacts the position which courts have universally taken; there is nothing new in it, for we hold that no case exists where a court has attempted jurisdiction to control lawful and peaceable action by injunction, although it may seem that sometimes judgment may have been faulty as to what particular action was "unlawful" or provocative of a disturbed peace. The challenge to the court is to define "peaceful picketing" within the limits of this section. This does not seem to be an occasion for an attempt at an academic formula, which, in any detail, would meet all exigencies possible in labor controversies, if one could be drawn up.

Each case presents its own peculiar questions. An act may be lawful and peaceful, or just the opposite, according to its setting. It is easier, and far more practicable, therefore, to deal in prohibitions than in affirmations. Broad generalizations, however, are easily framed, because, if we just keep in mind the prevalence in the statute of the qualifying idea of "peaceful" and "lawful" action, we cannot be misled. The best we have seen is one lately appearing in a newspaper devoted to labor interests. It is:

*"What constitutes peaceful picketing may be answered by any fair-minded man, if this question is asked, 'Would this be lawful if no strike existed?'"*

We accept this as a very good test, and apply it to the concrete questions of fact arising in this case, as propounded in the several informations, with conclusions certain to come to every "fair-minded man." Suppose no strike were in progress—

Would it be lawful for one or more men to use offensive, abusive, insulting, or threatening language to another or others—for one to call another a "rat," a "scab," a "thief," an "outcast," or by any other name commonly accepted as offensive, or degrading, or calculated to provoke the other to break the peace in resentment?

Would it be lawful for one man, or more, to take station adjacent to the place of rest, lodging, or work of another, or others, and there, by gesture, language, or otherwise, convey to the other insult or threat?

Would it be lawful for one or more men to force his or their talk upon the unwilling ear of another—to compel him to listen against his will?

Would it be lawful for one man or more to persistently follow another to and from his work, to his home or lodging, and about the city, forcing upon him unwillingly their presence, without occasion other than to unmistakably suggest to him their hostility unless he meets their views?

Would it be lawful for one to photograph another against his will, especially under circumstances which indicate unfriendliness to be the spirit, and a hostile use of the photograph to be the object?

Would it be lawful to slink upon an unsuspecting man, inoffensively gazing into a shop window, and deal him a blow—to step from the hiding of an alley to trip a lady, and then to strike her escort as he stoops to her assistance?

These questions are formulated upon the testimony produced in open court, because of which attachments were issued under the law, resulting in the filing of informations against which counsel for respondents has presented the motions we are considering. This court has heard other testimony upon which as yet no writs have issued. Upon the facts therein alleged, and upon alleged occurrences which have been the subject of comment in the public press since the middle of November as part of local contemporaneous history, we may ask certain other questions, and thus touch upon all the phases of disorder which have marked the city of Toledo in the time mentioned, and which there is apparent justification in assuming were incidents of the strike. If no strike were in progress—

Would it be lawful to intercept a young girl on her way to work, and beat and scratch her and tear her clothing; to destroy the telephone connections with public hospitals, so as to leave them without means of communication; to destroy fire department lines, hazarding the safety of property; to so menace, threaten, and frighten the employés of another as to make it necessary to convey them to and from their work in armored or protected cars; to so act as to gather large crowds of bystanders and curiosity seekers about places of business, to the interruption thereof; for a crowd of a dozen or more men to surround a vehicle, follow it through the business streets of a city, shouting offensive names, stopping or interfering with traffic; to cut automobile tires; to strew tacks in streets for the purpose of destroying tires; to throw bricks and stones at automobiles; to assault and beat a boy engaged in delivering water to a place of business; to assault persons entering one of the prominent hotels of the city, or to follow such persons from their place of employment to said hotel, calling them offensive names and causing crowds to gather?

Of course, the court is not assuming that these things are established facts, or that the commission of any of them should be charged to any parties now before the court, although the public prints, without any denial, ascribed some of these transactions to the activity of strikers on picket duty, who are parties to this cause. We are calling attention to them only because they are incidents not uncommon in labor controversies, and as such occurrences were not noticeable incidents of the city's history prior to November, 1916, except in cases of other strikes, and as it is not understood that the defendant company was having such experiences before that date, it is not unnatural to assume that they were induced, those that really occurred, in some manner by the labor controversy which caused this suit. Because such occurrences are liable to be the result of passions inflamed by such con-

troversies, there is an insistent and undeniable demand that all persons having part in a strike, who are trying to exercise their rights under the law to maintain a strike, should be persistent in their efforts to keep the controversy within lawful bounds and to guard that these inexcusable results do not follow; otherwise, in the estimate of the public generally, they will be held to some considerable measure of responsibility.

"Any fair-minded man" will answer each of these questions above stated in the negative. It must be borne in mind that not every act is lawful against which no positive provision of law exists. Many acts are unlawful for which no affirmative penalty is enacted, or against which no redress at law is possible; and some, while within the prohibitions of positive law may not offer a practicable occasion for redress at law, yet a court of equity may be asked to protect the intended sufferer from the annoyance and damage they may create, and such a court may enforce its prohibitions. No legislation yet exists to the contrary, if legislation depriving courts of such power is possible. Some acts, lawful when but once performed, may become unlawful when repeated for the purpose of annoyance or damage, and may be restrained when that purpose becomes plain.

The right of free speech does not give any one the privilege to force his views upon others, to compel others to listen. The right of the others to listen or to decline to listen is as sacred as that of free speech. It is clear that, if one does not desire speech of another, he may as surely have his privacy therefrom as the privacy of his home. It is undeniable that the so-called right of peaceful persuasion may be lawfully exercised only upon those who are willing to listen to the persuasive arguments.

Again, every man has the right to the pursuit of his lawful business or employment undisturbed, and any act performed with intent to disturb the full and unrestrained exercise of his faculties and wishes in such employment is plainly unlawful.

Again, he has the right of privacy and freedom from molestation of private persons, hostile or otherwise, at his home, at his lodging, at his place of work; he has the right to walk the streets without annoyance from the unwelcome attentions of others, so long as he is conducting himself in a lawful manner.

Again, the right of one to the privacy of his own features, to the end that he may not be photographed without his consent, is manifest. It has been sustained by the courts in actions for damages.

Again, the right of one man to work is as much entitled to respect as the right of another to cease work or to strike.

Again, the right of an employer to engage whomsoever he chooses is as strong as the right of an employé to refuse to work.

Again, the right of an employer to have access to and from his place of business, and his right to have the streets and public highways in front of his place of business kept clear of crowds, bystanders, and curiosity seekers, is as strong as the right to picket, and no picketing which is conducted in a manner to attract and retain the presence of crowds can be said to be peaceful or within the law.

It is a safe and proper generalization that any action having in it the element of intimidation or coercion, or abuse, physical or verbal, or of invasion of rights of privacy, when not performed under sanctions of law by those lawfully empowered to enforce the law, is unlawful; every act, of speech, of gesture, or of conduct, which "any fair-minded man" may reasonably judge to be intended to convey insult, threat, or annoyance to another, or to work assault or abuse upon him, is unlawful. Not a syllable of the Clayton Act, or of any other law, whether of legislation of Congress or of the common law, sanctions any of the incidents we have referred to. They are to be condemned as legally inexcusable—such must be the verdict of "any fair-minded man"—nothing can be said in justification.

These propositions are so elemental that, but for the confusion which exists in many minds that a labor controversy affects the commonest rules of life, it would seem a waste of time to state them. The existence of a strike does not make that lawful which would otherwise be unlawful. These personal rights to which we have alluded are, in each instance, precisely those which the striker himself would insist upon were conditions reversed. They are also so plain, and the answers to the questions involving them so certain, that one called upon to enforce the law, if he has but ordinary intelligence, will plainly fail to do his duty when in his presence a fellow citizen suffers an invasion of his rights of this character.

The things we have mentioned are so clearly unlawful that the failure or refusal of public officials to prevent their occurrence or to punish their commission presents a plain and reprehensible evasion of official duty. Any officer of the law, a policeman, for example, ought to know that such acts are in violation of law, and of individual rights, subjecting their perpetrators to restraint and to punishment; he must know that a sworn duty devolves upon him to arrest the guilty party, and that such an arrest would be, in no respect, an invasion of any right arising from a strike or the right of peaceful picketing. Having a mind capable of understanding the question, "Would this be lawful if no strike existed?" he could have no difficulty in seeing his duty to prevent such occurrences. If the court may accept as reasonably accurate the testimony it has heard, and if we may accept as fairly reliable the history of Toledo as it was detailed in the newspapers in the months of November and December, wherever the responsibility therefor may be placed, no "fair-minded man," in our judgment, can say that the plain rights of individuals and the right of the public to order were in all possible cases observed and preserved to the degree which law and official obligation demanded.

The labor organization, party to this case through the representation of Hoffman, came here voluntarily and was admitted upon its application and the statement of its counsel, in the presence of the officers of the organization, that the injunction then in force would be observed and respected until it should be modified or vacated by this court. Indeed, we have, as we have observed, exactly the injunction which the labor defendants in this court agreed should be issued. Yet it pleads that it intends to "interfere" by all "lawful means" with the business

of the defendant company. It should know, and act upon the knowledge, that the only "interference" which the law permits is that incidental to a strict observance of the terms of section 20 of the Clayton Act. If it goes beyond the privileges of action therein provided, it comes within the court's restraining and punitive processes. Its only safe course, in pursuing its "interference" methods, is to place intelligently and carefully, in word and conduct, the same emphasis which Congress employed on the expressions "lawful" and "lawfully," "peaceful" and "peacefully," as used in the act.

[8] The Ohio State Telephone Company is a public utility. Its first duty is to serve the public. Its work meets a vital public necessity. The right of its striking employés to "interfere by lawful means" with its business does not mean a right to cripple performance by it of its duties to the public, if it can find people willing to work for it. If labor can be had, the company must employ, and the strikers must permit it to employ and use, labor to perform its public duties, and any one willing to work for it must be allowed by everybody entire freedom to do so. The public, having a great need for services of the character offered by this public utility, has an enforceable right to demand these conditions of both the company and of those associated in controversy with it. This court is empowered to say to the company that it must meet its public obligations. Coupled with that power of the court is the power and duty of laying its prohibitive and punishing hand upon any one whose willfully unlawful conduct tends to render abortive the exercise of that power. We can no more say to the company that it must yield to the demands of its striking employés than we can say to them that they must meet the company's exactions. The controversy must be carried on, on both sides, without substantial detriment to the company's public service.

"Peaceful picketing" is exercisable only within these limitations; no "interference" with the company's business is lawful which exceeds them. Whatever may be the effect of this provision of the Clayton Act now under consideration upon controversies engaging corporations not public utilities and their employés, we cannot believe that Congress enacted against the public welfare to sanction more than we have above indicated.

[9] Two maxims, which have much the same meaning, are universally treated as controlling all legislation and as limiting all personal rights. They are "Salus populi est suprema lex," and "Salus reipublicæ suprema lex." Liberally translated, they mean that the public welfare is the first and supreme consideration. They are the law of all courts and all countries. Individual rights universally are, and plainly must be, subordinated to the public good, and of this principle we have many applications, of which the superior quality of the public's interest in the service of a public utility vitally conserving the public welfare is one. Congress must be considered to have legislated in the light of this principle, which must be resorted to as one essential criterion of interpretation of the acts of all legislatures.

[10] Holding, as we must, that the public interest in the company's public service is the first consideration, that it is paramount to that in-

terest in the company's affairs held by the very small fraction of the public which would work for the company, and to that enjoyed by that other very small fraction whose members hope for a return from their investments, we are unable to agree with respondent's counsel that the order is deficient, because it does not conform to the provision of section 19 of the Clayton Act that an injunction order should specify in "reasonable detail" the things enjoyed. That portion most vigorously attacked as too broad and indefinite is the provision restraining the doing of—

"any acts or things which may interfere in any respect with the performance of the duties and obligations of the defendant company as a common carrier."

This provision is as definite as it is possible to make it. It is this paramount interest in the public which may not suffer interference as the result of the controversy, and it is impossible to set out every act or line of conduct which might work interference. Labor controversies are not unexpected or unusual; courts recognize that they are possible; courts also notice that the existence of one produces some embarrassment · to the employer affected in the management of his business. Whether that embarrassment arises to a state of "interference," as that term means in cases of this sort, depends upon how the controversy is conducted on either or both sides. A total cessation of the employer's business, even of that of a public utility, might not indicate an illegal interference under some circumstances. A strike *lawfully* conducted is not an illegal interference, although it might effect even a total paralysis of a public utility's activities, resulting in great public suffering and loss. The right to abandon employment, by individuals singly or in association, is unquestioned, and the law maintains the right of such late employés, commonly known as strikers, to "peacefully" persuade others to abandon the same employment, or to refrain from engaging in employment, and to that end "peaceful picketing" is permitted for purposes of observation and information and "peaceful persuasion." But no single act, to which we have alluded above, can be possibly considered to be a necessary, and hence an excusable, accompaniment of peaceful picketing. Such acts tend inevitably to that "interference" which the law condemns.

In a recent decision, Tri-City Central Trades Council v. American Steel Foundries, 238 Fed. 738, —— C. C. A. —— (October Session, 1916, 7th Circuit Court of Appeals), which the public prints treated as one favorable to organized labor, this language occurs: -

"Plaintiff's contention that a court may restrain lawful acts of striking employés when committing and carrying out the purpose of an unlawful conspiracy to destroy the employer's business is supported by many authorities (citing [Sailors Union of Pac. v. Hammond Lumber Co.] 156 Fed. 450 [85 C. C. A. 16]; [In re Debs] 158 U. S. 564 [15 Sup. Ct. 900, 39 L. Ed. 1092]; [Barnes & Co. v. Chicago Typographical Union No. 16] 232 Ill. 424 [83 N. E. 940, 14 L. R. A. (N. S.) 1018, 13 Ann. Cas. 54]; [Karges Fur. Co. v. Amalgamated Woodworkers Local Union No. 131] 165 Ind. 421 [75 N. E. 877, 2 L. R. A. (N: S.) 788, 6 Ann. Cas. 829]). * * * If the purposes of the undertaking complained of were purely and simply, or even primarily, interference with the plaintiff in the conduct of his business as alleged, no act, however innocent in itself, directed to that end, can be said to have a lawful purpose for its doing."

We cite and quote this case, not because it presents a novel doctrine, but simply because it is the latest on the subject. It is a legal proposition, too firmly settled to be disregarded, that two or more persons may not combine to employ activities, in which singly they might lawfully engage, with an intent that the effect of their joint action should be the injury of another, and there is absolutely nothing in any provision of the Clayton Act, and we have in mind particularly sections 6 and 20, that weakens the force of this principle. The case we cite is decided with reference to the Clayton Act. In this view, we suggest that the bald statement in the pleading of the labor organization referred to that its purpose is to "interfere" by lawful means with the business of this public utility comes perilously near a confession that an unlawful conspiracy is in progress, and the only way that such a conclusion can be avoided is a line of conduct during the further continuance of this strike which will secure the public against that interference with the business of this public utility which is the direct result of the unlawful acts of the character of those to which we have alluded. Accompanying the strike have been occasions of undoubtedly unlawful interference. If convictions should follow the charges now before the court, involving members of Local 245 when on "picket" duty, the attitude of the union as a law-abiding organization would be prejudiced very unfortunately, especially when it is considered that it formally urges to this court its purpose to "interfere" with the company's business. If its members will confine their strike activities within the limits of the Clayton Act, then whatever embarrassment ensues to the company will be no illegal interference.

The court's views as to what is and what is not peaceful picketing in the instant case are sustained by an unbroken current of authority. The early authorities are summed up in Labatt on Master and Servant, vol. 7, p. 8364. Our position is consistent with Judge Tayler's opinion in a local case. Pope Motor Car Co. v. Keegan (C. C.) 150 Fed. 148. We cite but two additional cases, already referred to in this opinion, because they are the latest cases and deal with conditions since the Clayton Act was passed, namely, Tri-City Central Trades Council v. American Steel Foundries, supra, and Alaska S. S. Co. v. International Longshoremen's Ass'n of Puget Sound et al., supra. The concluding paragraph of Judge Neterer's able opinion in the last case cited we regard as specially worthy of the attention of the labor defendants in this case. We quote 236 Fed. 972:

"While there is no testimony that any of these acts were expressly authorized, there is no evidence that the acts were disapproved, or members disciplined or expelled. The testimony does show that the defendants did have control of the situation, and did not exercise their influence or power to correct the irregularities or disavow the acts until the issuance of the temporary restraining order and service upon the defendants, when all overt acts ceased, which, considered with what defendants did do, confirms the conclusion that the acts were under the authority and within the control of defendants. When persons or parties set in motion machinery for the purpose of shaping sentiment, they cannot take the benefits, without also being burdened with responsibilities. Such parties thereby assume the burden of controlling such agency, if within their power; and if, perchance, some persons unauthorized, acting with defendants, commit unauthorized acts, it is incumbent upon the defendants to

show such fact, and, if committed by members under the control of the association, to disavow such acts by causing such offending members to be disciplined or expelled."

A history of this controversy shows that, immediately after the issuing of the court's temporary restraining order, the most flagrant public manifestations of unlawful conduct ceased; that thereafter those things were done which could be done surreptitiously or with a smaller chance of detection, although one or more of the informations follow attachments after testimony involving several members of the union, and consequently parties to the injunction, in what appears to have been an indecent public disorder, which was permitted by a local peace officer, who was present, to proceed with no attempt at repression.

The informations in question are all lodged against members of the union. If the charges are sustained on trial, it would appear that they have violated the beneficent provisions of the act which their counsel claims gives them special consideration. It would seem, therefore, that more time for the honor of the defendant local union might be profitably spent in getting at the facts, the truth of the charges, and less to technical objections which have nothing to do with the merits.

If the court finds the several charges sustained by the testimony, if the acts, willfully performed, bear with reasonable certainty the construction that they were performed with coercive, intimidating, insulting, or annoying intent, that thereby the lawful business of the company may suffer interference, the court's duty is plain to say that the acts are not privileged by any law and are violative of the order in this case to which Hoffman and his fellow members consented. In such case, some more tangible and distinct proof is indicated to be necessary that the union honors the law its counsel invokes than mere disclaimer of responsibility. In such an event the unfortunate assertion in the pleadings that Hoffman and his associates intend to "interfere" by means of what they call "peaceful" and "lawful" measures would create a demand for action more definite than even words of condemnation by Local 245 of its guilty men. Judge Neterer, in the opinion quoted, points out the way. The law that is called upon to protect Hoffman and his fellow members should be honored by it. The local and defendant union "set in motion machinery for the purpose of shaping sentiment"; its responsibility is clear to control such agency within lawful bounds.

We make these observations, not to convey an impression that any one under charge is guilty—no one has been tried, and we may have no opinion yet—but moved by a profound conviction that, because of the undeniable lawlessness which has accompanied the telephone strike, and because of the condition of the record made so far in this case, an imperative demand exists now, for its own good, for affirmative action by Local 245 to range itself definitely on the side of law and order, if it would have that efficiency for social good of which organized labor is capable, and which alone justifies its existence, and if it would have and retain public respect. The local should protect its members against unjust charges; its duty to itself and its membership is just as plain to

set itself sternly against disorder. There is no legal excuse for disorder in a strike; somebody is always responsible in some degree to the law for disorder.

The motions to the several informations should be denied.