### HOLMES v EMPLOYERS' LIABILITY ASSURANCE CORP., LTD.

Ohio Appeals, 2nd Dist., Franklin Co.

No. 3366. Decided Oct. 30th, 1941.

202

Thomas H. Clark, Columbus and George L. Dixon, Columbus, for plaintiff-appellant.

Wilbur E. Benoy, Columbus, August A. Rendigs, Cincinnati, Russell G. Saxby, Columbus, for defendant-appellee.

OPINION

By BARNES, J.

The above-entitled cause is now being determined as an error proceeding by reason of plaintiff's appeal on questions of law from the judgment of the Court of Common Pleas of Franklin County, Ohio.

The petition was filed October 18, 1939, and therein plaintiff sought judgment against the defendant in the sum of $10,000.00, with interest from the 2nd day of May, 1939, on an insurance policy issued by the defendant and in force on May 2, 1939, at the time of an incident allegedly covered by the insurance policy, whereby a boiler was completely destroyed. The claimed loss was $15,000.00, but the coverage on the policy was $10,000.00. The petition further alleged that the insurance policy indemnified the plaintiff against loss resulting from an accident as defined in the policy to an object as described in the policy.

The term "accident", as defined in the policy was a sudden, accidental tearing asunder of the object, or any part thereof, caused by pressure of steam or water therein. The object was described as a Keeler W. T. boiler, No. 2-7197, including water columns, steam and water gauges, safety valves, water walls, water screens and other equipment.

The defendant in its answer made admissions as to its being an insurance corporation, duly authorized and admitted to write steam boiler insurance in the State of Ohio, and at the same time mentioned in the petition there was in full force and effect the policy of insurance issued by the defendant company; admitting that under the terms of the policy defendant insured the plaintiff against loss resulting from an acci-

dent, as defined in the policy, to an object as defined in the policy, to the extent of $10,000.00. The answer further admitted that some time subsequent to the 2nd day of May, 1939, the plaintiff notified defendant of the happening which had occurred on the premises of plaintiff, involving a certain boiler therein and presented a claim to the defendant for damages, which claim was refused by the defendant for the claimed reason that the policy of insurance sued upon by the plaintiff did not cover or protect the plaintiff from the happenings referred to. Following the admissions, the answer presented a general denial.

The case was tried to a court and jury, resulting in a verdict for the plaintiff in the sum of $7740.00. During the course of the trial, defendant, at the close of plaintiff's testimony, introduced a motion for a directed verdict, which was renewed at the close of all the testimony. Both overruled.

Following the return of the verdict defendant filed motion for judgment notwithstanding the verdict, and also by separate motion asked for a new trial.

The trial court sustained the motion for judgment notwithstanding the verdict and entered final judgment against the plaintiff and for the defendant.

The motion for new trial was passed.

Within statutory time plaintiff filed notice of appeal on questions of law.

Plaintiff's assignment of errors is set out under three separately numbered and stated specifications, and reads as follows:

"1. The Court erred in granting judgment for the Defendant-Appellee upon the special findings for the reason that the special interrogatory was improper and should not have been submitted to the jury, and its answer was not irreconcilable with the general verdict, and judgment should have been rendered on the general verdict of the jury.

2. The Court erred in granting judgment in favor of the Defendant-Appellee on the evidence notwithstanding the verdict, and in not granting judgment for the Plaintiff-Appellant upon the general verdict of the jury.

3. The court erred in passing the motion for a new trial when the same should have been overruled."

We think it more logical to consider assignment No. 2 first, since the determination of this assignment necessarily involves a consideration of the entire record and will give a better understanding of the question raised under assignment No. 1.

Counsel for the respective parties have presented very able and comprehensive briefs. The record contains some 365 pages, together with a great number of exhibits, most of these being photographs of the conditions following the alleged accident. The policy of insurance was introduced in evidence and presented as an exhibit.

The terms of the policy are clear and no questions raised as to its terms. The sole question is as to whether or not the alleged accident comes within the terms of the policy.

The word "accident", as mentioned in the policy, is defined under subdivision C of the schedule and reads as follows:

"As respects any object described in this schedule, "accident" shall mean a sudden and accidental tearing asunder of the object or any part thereof caused by pressure of steam or water therein, or the

sudden and accidental crushing inward of a cylindrical furnace or flue of the object so caused."

Under section 1 there are excluded certain losses as follows:

"Including (a) a loss from fire (or from the use of water or other means of extinguishing fire,) (b) loss from an accident caused by fire, (c) loss from delay or interuption of business or manufacturing or process, (d) loss from lack of power, light, heat, steam or refrigeration, and (e) loss from any indirect result of the accident."

In order to understand whether the incident comes within the provisions of the policy, it is necessary to make a careful examination of the entire record. This we have done. The part of the record including the testimony of plaintiff's witnesses we have read a second time. This was deemed necessary in view of the court having entered final judgment against the plaintiff, and appreciating that if the record presented substantial evidence supporting plaintiff's claim that the trial court should not enter final judgment even though the verdict of the jury might be against the manifest weight of the evidence.

The property covered by the policy was practically totally destroyed, yet there remains the question as to whether or not this damage was caused by a sudden and accidental tearing asunder of any part thereof by pressure of steam or water therein, or was it as claimed by defendant, caused by fire, the latter being excluded from coverage.

The boiler in question was very large, being described by one witness as almost as large as the court room where this case was being heard. It was rated as a 250 horse power boiler, and was known in the trade as a tubular boiler. In its interior construction it consisted of a large steel cylinder drum, three feet in diameter and 21½ feet in length. In the rear and near the bottom of the interior of the boiler construction was a second tank of the same diameter, but only about one-half the length. The front of the boiler was the fire box, and was about 8 feet in height, 8 feet in width and probably 10 or 12 feet in depth. At the rear end of the fire box was a fire brick wall and interspersed back of other walls were baffle plates, all designed for the purpose of deflecting the flame and burning the gases as they would enter the rear chamber. Along the side and above the fire box and extending to the back of the entire construction was what has been designated water headers. These were probably 8 inches square. The upper boiler and water headers and also the lower boiler were connected by some 400 or more tubes, 2 to 2½ inches in diameter, outside dimensions. These tubes were inserted in the upper boiler near the center (as distinguished from top and bottom), through holes a little larger than the tubes, and in the construction were cold rolled. This process seems to be recognized in the trade and in substance consists of expanding the tube from the inside of the boiler so that it would completely fill the hole through which it was inserted, thus pressing the ends down solidly against the inside of the boiler so that it would prevent the escape of water and steam. These tubes were variously estimated at from 9 to 12 feet in length, and extended down to the lower boiler or the water head and were inserted therein by the same process.

In filling the system with water, it would be pumped into the up-

per cylinder and by gravity descend through the tubes until the entire system was filled with water. In operation, the upper tank would be filled just a little more than half full. This would be some 2 to 3 inches above the points where the tubes would come through the cylinder. The space above the water level would constitute the steam chamber. On the top of this upper cylinder were two pop-off valves, designed to release the steam when it would get up beyond a fixed pressure. In addition, there was another valve through which steam would pass through a line to certain fixtures in other parts of this four story building, for use in its laundry business. There was also a return line from these fixtures so that the condensed steam would be returned to the boiler room and then again pumped into the system and used over and over. There was also installed a water softener, whereby the water was first softened before it was pumped into the boiler. The fuel used was coal. This was elevated in the first instance to a container at a height and then through chutes would pass down to a stoker. By means of a screw construction the coal was then crushed and elevated to a point where the fan would blow it through a tube into the fire box, and under such control that the greater part of it would be burned in suspension, only the heavier part of the coal falling on the grates. The stoker also had an electrically operated fan that gave an extra supply of air to the fire box.

The usual time of closing down the plant was four-thirty o'clock. During working hours there was an engineer in charge. The signal for closing was by steam whistle. At that time all fixtures to which steam was piped would be shut off and no further steam would pass through this line. It was then the duty of the engineer to shut off the water so that no more would be fed into the system. According to his testimony, a supply of water was fed continuously into the system during operation. He also shut off the stoker so that no more fuel would be fed into the fire box. According to his testimony, this was done on the night of the accident and he left the plant a little after four-thirty. About eleven o'clock the Fire Department was called, and when they entered the boiler room at the rear entrance they found the entire outside of the boiler red hot. Some described it as a cherry red; others as a white heat. When some of the firemen opened the fire doors of the boiler, molten metal and slag ran out of the doors like taffy. According to the testimony of one of the firemen, after he saw the situation he began to turn off the switches. When he turned off the first one, he observed no results. On turning the second, the blower fan stopped, and in turning off the third, everything seemed to stop. No water was thrown by the Fire Department except a possible small quantity where some wooden construction in the rear and above had been set afire from the extreme heat. It took several hours for the boiler to cool off so that it could be examined. The stoker was provided with a measuring device, designated as a speedometer, through which the quantity of coal fed into the furnace could be measured. This speedometer was very similar to an automobile speedometer, and measured the quantity in miles. It was testified that a mile constituted about 750 pounds. The amount of coal, according to the testimony of the engineer, used in an eight hour day would be approximately 16 miles. This speedometer was also constructed so that at the **end**

of each day it could be shut off and set back to zero, and the engineer testified that this was done on the evening of the night of the fire. He further testifies that when he got to the plant following the accident, the speedometer showed approximately seven miles of coal had been used. Of course, it is self-evident that the engineer is mistaken when he says he shut off the coal supply before leaving the plant, or someone else turned it on thereafter. In any event, it is conclusively shown that it was operating sometime during the interim between 4:30 P. M., and 11 P. M., a matter of six and one-half hours. At the time the firemen arrived the stoker was not feeding coal as it was clogged in the hopper. This could probably be occasioned by the extreme heat in the fire box through which the feed pipe would be melted. The engineer lived quite a distance from the plant, but one of the chiefs of the Fire Department drove to his home and brought him back. He arrived probably about 12 in the morning.

So long as the system was filled with water there would be no probability of any damage. The boiler was comparatively new, having been installed the previous November. According to the testimony everything was in proper working order at the end of the day.

The stoker also had a construction through which it would be stopped when the steam pressure arrived at a certain height. This was slightly below the pressure at which the pop-off valves were set. As the pressure would drop the stoker would come on.

With no water being fed into the boiler, the water level would necessarily be lowered from time to time through the operation of the pop-off valves. It was testified that at each pop-off the water level would be lowered by about 7½ gallons.

When this water level receded below the tubes, then an entirely different situation would be created. Under normal operations the tubes would circulate hot water. When the water level in the upper cylinder was down below where water could be fed into the tubes, then steam would be generated therein and pass into the upper cylinder. Instead of being the means of circulating water as intended, they would have to take up the function of emitting steam. As the water level would sink in the tubes, the fire would have an abnormal effect upon the upper end of the tubes. The design of the boiler provided for expansion in that the tubes held the water heads and lower drum in suspension. A space of about one inch and a quarter was provided for the expansion. This was supposed to take care of a heat expansion many times greater than the normal heat furnished by the furnace.

The evidence was uncontradicted and all experts agree that so long as the system was filled with water it could not burn up. The water in the system had a cooling effect through which the B. T. units of heat could not be raised. After the water was out of the system, what under working conditions would be a normal heat, would become a melting heat. After the engine had cooled off so it could be examined, it was found that the tubes where they entered the upper cylinder had been pushed in a distance of nil to 5 inches. Many witnesses gave the average as 2 inches to 2½.

This is the situation upon which plaintiff predicates his claim that the damage was caused by steam forcing these tubes into the upper cylinder.

There being no eye witnesses to

what occurred between the time the engineer closed down the plant and left, shortly after 4:30 P. M., until the arrival of the Fire Department, at about 11:15 P. M., it necessarily follows that expert testimony would be requisite to the respective theories of the parties.

Plaintiff's expert witnesses testified in substance that the stoker operating normally and no water being pumped into the system, the water level would necessarily lower so as to be below the point where the tubes entered the upper drum; that the water in these tubes would gradually lower, emitting steam into the upper. drum; that as the water would lower in the tubes the heat would raise the temperature of the upper end of the tubes higher than the lower part thereof which was still filled with water; that the effect of the heat on the upper end of the tubes would be to soften and increase expansion; that the steam on the inside of the tubes would exert a tremendous pressure; that this abnormal steam pressure would have a tendency to straighten out the tubes (the tubes have a goose neck or bend at the top and bottom where they were inserted into the respective drums and water heads); that the straightening out of the tubes through the internal steam pressure would force the ends into the drum through the joints softened by the fire; that the opening up of these joints and the pushing of the tubes through the hole would release the steam pressure so that there would be no shutting off of the stoker and the fire in the fire box would continue uninterruptedly to the point that it would melt the tubes, fire brick, baffle plates and other things within the inside of the fire chamber.

The expert witnesses called by the defendant have a contrary theory, supporting the defendant's contention that the entire damage was caused by fire. These witnesses in substance claim that when the heat within the fire chamber reached the point where it expanded the metal, including the tubes, beyond the expansion provided for in the construction that this extreme heat at the point where the tubes entered the upper drum would soften the joint where the tubes entered the upper drum and since the lower drum and water head, through the expansion, was lowered to the solid foundation that the increased expansion would necessarily force the tubes into the upper part of the boiler, since they had no other place to go. These expert witnesses also testified that there would be no increased steam pressure within the system, even though the water was below the proper level in the upper drum until there was some break through which the steam would be released other than into the steam chamber in the upper drum; that this steam pressure would be constant, for the reason that the pop-off valves would take care of any excess pressure, even though the steam was coming direct from the tubes. We think all agree, and it necessarily follows, that after the water level was lowered in the upper drum below ·the tubes where they entered the upper drum, there would still remain water in the upper drum, but it would no longer circulate. This water in the upper drum would be converted into steam and the steam chamber would then not only receive steam from the upper drum but also through the tubes so long as there was any water therein, or in the lower drum or water head. Regardless of the source of the steam, the pop-off valves would keep it within bounds until there was a breaking of some part of the system through which the steam would

be released without entering the upper drum.

Witnesses for the plaintiff admit that the effect of the fire box heat on the upper part of the tubes after the water was lowered therein, was a contributing cause to the softening of this part of the tube and its entrance into the upper boiler which permitted the steam to push the tube inward.

On the other hand, defendant claims that even if the steam pressure had an effect in pushing the tubes into the upper boiler, that the fire box heat was responsible for the expansion and softening at the point where the tubes entered the upper drum.

We have no trouble in determining that the primary cause of the accident was the failure of the proper supply of water with the stoker operating.

The boiler and all its parts were doomed, even if the tubes had not been released, but the time would have been extended to the point where the water in the tubes was completely exhausted. Thereafter they would melt and be burned up, just as was shown happened.

Plaintiff urges that the evidence supports the theory that the breaking of the tube seats and their projection into the upper drum occurred first, and that the damage by fire occurred thereafter. Plaintiff's witnesses, however, all concede that it was the effect of excessive heat in connection with the steam pressure that caused the tubes to break loose and be injected into the upper drum.

The trial court in his general charge to the jury at that time told the jury that the fire and damage therefrom excepted from the provisions of the policy meant an outside fire and not a fire within the fire box where it was expected to be.

In passing on the motion for judgment notwithstanding the verdict, he states in his written opinion that after reflection he finds that he was in error in so charging the jury and that under the terms of the policy damage by fire is excluded, regardless of whether the fire originated inside or outside the boiler.

In this holding we think the trial Court was correct, by reason of the very plain ██ language of the insurance policy. The policy insured against accident, and under subdivision C, accident is defined as follows:

"Accident shall mean a sudden and accidental tearing asunder of the object or any part thereof caused by pressure of steam or water therein, or the sudden and accidental crushing inward of a cylinder, furnace or flue of the object so caused."

For instance, we take it that it is a matter of frequent occurrence that grates are burned out by continuous use. Of course, they are burned out by fire on the inside of the fire box, where it is expected to be. Certainly no one would claim that that would be damage which could be read under the provisions of the policy protecting against a sudden and accidental tearing asunder of the object or part thereof, caused by pressure of steam or water. This same might be true as to fire walls, baffle plates and other parts of the boiler containing no steam or water.

The same might also be true if the entire system was emptied of water and thereafter a fire was built in the fire box and permitted to go on uninterruptedly, causing a partial or total destruction. The damage would be unquestionably caused by fire, and merely because

it was inside the fire box would not relieve the situation of being excluded within the exceptions under the policy.

Where the system is filled with water to the proper level, all experts agree that the system could not burn up. Where the water level in the system becomes lowered and damage is thereby caused, as in the instant case, the question arises as to whether or not the fire or steam was the proximate cause of the accident and its results.

Counsel for plaintiff places major reliance upon the case of Travelers Indemnity Co. v Davis Laundry and Cleaning Co., 27 O. L. R., 538. This case originated in the Common Pleas Court of Cuyahoga County, where judgment was entered for the Cleaning Company against the Insurance Company, and the latter then carried the case to the Court of Appeals. The above report is that of the Court of Appeals. Judge Houck, of the 5th district, rendered the opinion, which was concurred in by Judges Lemert and Lloyd, the latter of the 6th district, sitting by designation in place of the Judges of the Eighth District. The judgment of the trial court was affirmed. We have examined this case with great care. We are unable to find it of any assistance. The reported case has similarity in that it involved an action by a Laundry Company against an Insurance Company for claimed damages allegedly covered under the terms of a policy. Judge Houck in his opinion makes the following observation:

"Was the explosion or injury to the boiler in question, caused by overheating and without steam pressure as claimed by defendant."

Later on in the opinion we find the following:

"Counsel for defendant admit in oral argument that if there was any substantial evidence in the record sustaining the claim of plaintiff that the explosion of the boiler was caused by steam, then in that event the plaintiff was entitled to recover."

The learned judge then states that this statement of counsel makes it necessary to read the entire record to determine whether or not there was substantial evidence warranting the jury in its verdict for the plaintiff. The Court of Appeals held that the record presented evidence sufficient in substance to sustain the verdict and therefore affirmed. It clearly appears that the question was one of fact, but the reported case does not present the facts, and hence we are unable to determine whether or not the facts in the reported case and the instant case are similar.

In the reported case reference is made to the decision of the Supreme Court in the case of The Cleveland Drop Forge Co. v Travelers' Indemnity Co., 114 Oh St 549. This case also originated in Cuyahoga County, and was an action on an insurance policy indemnifying the assured in the event of a boiler explosion "for loss or damage directly caused thereby." In addition to the damages through explosion other damages contended to be incident thereto, were included, and the trial Court instructed the jury that it might consider all damages. The Court of Appeals reversed and the Supreme Court affirmed on the ground that only direct damages were recoverable.

In the instant case the trial Court charged the jury in substance that if it found for plaintiff, damages would be limited to $8000.00, which necessarily includ-

ed not only the rupture where the tubes entered the upper drum but all damages caused through the fire. On the application for judgment notwithstanding the verdict, he states that he was in error and that under no circumstances could the amount of recovery be more than the cost of repair of the tubes into the upper drum, and since no evidence was introduced through which the jury could award any damages, there was a complete failure of proof on this element.

If the case turned on this question, we doubt very much if the Court would correct in entering final judgment, but there would be a reversal and remand for new trial. We do not think that the mere fact that the plaintiff under a mistaken theory fails to separate his damages as to amount should deprive him of a new trial. If under the facts of the case the damage to the tubes being pushed into the upper drum is recoverable under the terms of the policy, a new trial should be ordered and not final judgment entered for the defendant. At this time it must be understood that this action of the trial Court can not be considered prejudicial error unless under the entire record there is substantial evidence warranting plaintiff's recovery in some amount.

Counsel for plaintiff also cite 8 Corpus Juris, 1140, §3, which reads as follows:

"In determining the cause of a loss for the purpose of fixing insurance liabilities, when concurring causes of damage appear, the proximate cause to which the loss is to be attributed is first the dominate—the efficient—one that sets the other causes in operation; and causes which are incidental are not proximate, although they may be nearer in time and place to the loss."

The above quotation is taken literally from the case of Insurance Company v The Pabst Brewing Company, 201 U. S., 617. To the same effect will be found a similar pronouncement in the case of 11 N. Y., 516. Also see note 13, 8 Corpus Juris, §1140, wherein 96 Maryland, 616, is quoted from.

We think these principles are applicable, but we doubt very much if under the facts of the instant case they are beneficial to plaintiff's cause.

Counsel for defendant refer us to the following authorities on question of proximate cause:

Insurance Company v Boon, 95 U. S. 117. The fire insurance policy excepted destruction by fire or by means of an invasion by any military or usurping power. The Court held that the attack of the Confederate Army constituted military invasion. The insured property was destroyed by fire emenating from military stores which were purposely burned by a Union general to avoid capture by the Confederate Army. The United States Supreme Court held that the attack of the Confederate Army constituted military invasion, and that this was the proximate cause of the insured's loss.

We are also referred to Couch on Insurance, 2595, §1463; G. R. Booth, 171 U. S. 450: Mitchell v Potomac Insurance Co., 183 U. S. 42; Mueller v Globe and Rutgers Insurance Co., 240 Fed. 759; Bird v St. Paul Fire and Marine Insurance Co., 224 N. Y. 47 (13 A. L. R. 875).

The last cited case was a decision by Judge Cardoza. The policy of insurance provided for loss against damage by fire. The policy contained an exception providing that the Insurance Company should not be liable for damages caused by the explosion of a boiler. In the reported case there was an explosion of a boiler and the explo-

sion caused the fire. The Court held that the explosion was the proximate cause of the damages and recovery was denied.

We are also referred to the case of United States Fire and Marine Insurance Company v Foote, 22 Oh St 340. This being an Ohio case, it thereby becomes more important. The policy involved was a fire insurance contract that excepted loss from explosion. Vapors from stills on the property of the insured were ignited by burning gas jets, causing an explosion and fire throughout the building. Although the damage to the property was done by fire, the Court held that such was caused by explosion and consequently was within the exception of the policy.

There is also cited the case of Dyer v Fire Insurance Company, 53 Maine 118.

Reference is also made to the case of German Fire Insurance Company v Roost, 55 Oh St 581. A fire insurance policy on a house and contents contained a provision that "this insurance does not apply to or cover any loss by explosion unless fire ensues; and then the loss or damage by fire only". It also contains a provision "that this policy insures against any loss or damage caused by lightning to the interest of the insured in the property described, not exceeding the sum insured, and subject in all other respects to the terms and conditions of the policy". Across the street from plaintiff's building there were stored in a certain powder house, explosives. Neither the insurer nor the insured had any control over this building, located 73 feet away. The powder house was struck by lightning, causing an explosion of the powder. By force of the explosion the insured house and contents were totally destroyed. The court held "that within the meaning of the clause re-

cited, the loss was occasioned by explosion which was not included in the risk, and that the company is not liable."

In the case of Michigan F. & M. Insurance Company v Whitelaw, 1 C. C., N. S. 412, affirmed 73 Oh St 365, an exemption in a fire insurance policy relieved the company from liability in case of riot. A mob fired the city building in Akron, and from thence fire was communicated over to the adjoining insured building; which was wholly destroyed by fire. Held, that since the cause of the loss was riot, the company was not liable.

After considering the entire record in its most favorable light to plaintiff, we are █ constrained to the view that fire was the proximate and probably the sole cause of the damage to the boiler in question.

A second question that is presented is whether or not the exemption of "fire" in the policy should be construed to mean only fire originating outside of the boiler and not within.

Counsel for plaintiff urge that this must necessarily be construed as intending to refer to fire outside the boiler, since steam can only be produced through fire and that the boiler was so designed to burn coal to produce steam and that this was known to the insurer. In support of this theory, counsel for plaintiff refer to the case of First National Bank of Boone v Royal Indemnity Company, 186 N. W., 934 (193 Iowa 221). In this case the insured coverage was on a low pressure boiler. It was insured against loss or damage by explosion, rupture or collapse caused by the pressure of its contents. In addition, the policy covered cracking or fracturing of the case iron boiler. For this coverage an extra premium was charged and

hence injuries of this character were not controlled from the exception including explosion, rupture or collapse caused directly or indirectly by fire. It was the determination of the Supreme Court of Iowa that there was no evidence supporting the provisions of the policy covering explosion, rupture or collapse, as defined in the policy. The liability, if at all, must be under the extra premium provisions covering cracking or fracturing of the iron boiler. The court called attention to the fact that under the schedules the policy very carefully defined what was meant by explosion, rupture or collapse as provided under the general provisions, but did not contain any specific definition of cracking or fracturing, as covered by the policy for which extra premiums were charged. There were some provisions in the policy very general in their nature, which apparently the Insurance Company was urging excluded cracking or fracturing caused by fire.

The court at great length analyzes the various provisions of the policy and determined that the general provisions relating to fire obviously were not intended to be applicable to this particular coverage in the policy. The court in its reasoning makes many observations which counsel for plaintiff in the instant case quote and argue are applicable. It is a well recognized principle of law that all cases must be read in the light of the issues and the factual questions under consideration. Tested by this standard, we are unable to say that the Iowa case and the instant case are parallel.

In the Iowa case the Supreme Court was pointing out that the coverage under the extra premium provisions for cracking or fracture would be meaningless if all possible damage by fire was excluded.

This would be on the well known fact that the boiler was expected to have fires in its normal operation; that fires produce heat; that heat produces expansion; that uneven expansion might produce fractures. In the reported case all the court said was that the question was one of fact for the determination of the jury. In the instant case there was no coverage, such as was provided in the extra premium provisions of the policy in the reported case. In the opinion the court does make some reference to hostile fires as distinguished from friendly fires. It is probably true that the language of the court in defining a hostile fire is broad enough to exclude any fire under the boiler where it is intended to be. This part of the opinion must necessarily be limited to the facts of the case then being considered by the court. We quite agree that a normal fire in a fire box under a boiler would not be a hostile fire, but where such fire is operated in such a manner or under such conditions that it gets out of control and develops a heat of from 2800 to 3200 degrees, it must then be considered a hostile fire.

Counsel for plaintiff also refer us to another Iowa case, entitled Githens v Great American Insurance Company of New York, decided in 1926, and reported in Volume 44 American Law Reports, annotated, page 853. This case is not at all parallel with the instant case, although it is a discussion on hostile and friendly fires.

The principal question involved and determined in the Githens case, supra, is in direct conflict with the Supreme Court of Ohio as set out in the case of German Fire Insurance Company v Roost, 55 Oh St 581.

Most of the cases where there is presented the question of friendly or unfriendly fires, occur where liability is claimed under fire insurance policies. In these cases the Insurance Company and the insured maintain directly opposite positions from that of the instant case. In other words, in these reported cases we find the Insurance Company denying liability under a fire insurance policy under the claim of a friendly fire. It is obvious that the principles are identical and hence an examination of these cases will be found helpful.

Under ordinary fire policies it has been held that companies are not liable where the fire causing the damage is controlled for the purpose for which it is intended; such as being in the fire box of a stove, and the damage has been caused by coming in contact with some object brought against the stove. **Hanson v Lamars, etc., 20 O. L. R. 864.**

A case somewhat in point holding no liability is that of **United L. F. & M. Insurance Company v Foote, 22 Oh St 340-349.**

Counsel for defendant have made reference to a number of cases where the question of friendly or unfriendly fires has been discussed. We will make reference to these opinions without further comment:

Cabbell v. Milwaukee Mechanics' Insurance Company, 218 Mo. Ap., 31; (260 S.W., 490).

O'Connor v Queens Insurance Company, 141 Wis., 338; (122 N. W., 1038).

5 Couch on Insurance, §1201, page 4392.

Progress Laundry & Cleaning Co. v Reciprocal Exchange, 109 S. W. (2d), 226.

Papadakis v Netherlands F. & L. Insurance Co., 137 Washington, 430; (242 Pac. 641).

Way v Abington Mutual Fire Ins. Co., 166 Mass., 67 (43 N. E., 1034).

It is our determination that counsel for plaintiff's contention that the explosion in the boiler by reason of fire is not applicable because of a friendly fire, is not well taken. As heretofore stated, it is our conclusion that the fire was the approximate cause of all damages and that the trial court was correct in so finding and entering judgment notwithstanding the verdict.

Having sustained the trial court on the matter of final judgment, the other claimed errors become unimportant. However, since the General Code provides that a reviewing court shall pass on all errors, we will take up at this time assignments Nos. 1 and 3.

At the request of counsel for the defendant, the court submitted to the jury the following interrogatory:

"Do you find that the loss sustained by the plaintiff was caused by reason of a sudden and accidental tearing asunder of plaintiff's boiler or any part thereof as a result of the pressure of steam or water therein caused by fire?"

The jury's answer to this interrogatory was "yes".

As an additional ground for entering final judgment notwithstanding the verdict, the trial court determined that the jury's answer to the interrogatory was inconsistent with their general verdict and for that reason the general verdict could not stand.

We have studied the language of this interrogatory with great care, and are constrained to the view that it should not have been given. As answered, it seems to us more consistent with the jury's general verdict than had it been

answered "no". As worded it seems to us it did not fairly submit to the jury the question which was in issue. Under such a situation it should not have been given. Prudential Insurance Company of America v Mary Kilbane, 15 C. C. 62.

Furthermore, we do not think that it clearly appears that the answer of the jury was inconsistent with their general verdict.

Our conclusion on this assignment of error will not alter our affirmance.

Under assignment No. 3, complaint is made that the court failed to pass on the motion for a new trial. The trial court ▮▮▮▮▮▮ after entering final judgment passed the motion, and in this we think he was correct.

**Stevens v Akron Palace Theater Corporation, 3 Oh Ap 401.**
**Shipe v N. & W. Ry Co., 51 Oh Ap 361-371.**
**Davis v Turner, 69 Oh St 101-115-116.**

When the court entered final judgment this constituted the final determination of the case, subject to review. The trial court could not then order a motion for new trial, even though he stated that the finding of the jury was against the manifest weight of the evidence.

The judgment of the trial court will be affirmed and costs in this court adjudged against the appellant.

Entry may be drawn accordingly.

GEIGER, PJ., and HORNBECK, J., concur.